# MINNEAPOLIS GAS COMPANY v. L. P. ZIMMERMAN.

91 N. W. (2d) 642.

July 11, 1958—No. 37,568.

*Miles Lord,* Attorney General, *Robert W. Mattson,* Deputy Attorney General, and *Sydney Berde* and *Jerome F. Chapman,* Special Assistant Attorneys General, for appellant.

*John C. Benson, Wright W. Brooks, Faegre & Benson, Ralph H. Lee, George C. Mastor, Farnand, Lee & Mastor,* and *Daniel R. Hart,* for respondent.

*G. Aaron Youngquist* and *Youngquist, Comaford, Danforth, Fassett & Clarkson,* for Minnesota Valley Natural Gas Company, amicus curiae.

*Louis B. Brechet,* for Minnesota Telephone Association, Inc., amicus curiae.

*Richard E. Kyle, Frank Hammond,* and *Briggs, Gilbert, Morton, Kyle & Macartney,* for Minnesota Municipal Utilities Association, amicus curiae.

*Gustav C. Axelrod,* for Minnesota Automobile Association, amicus curiae.

*Cyrus Erickson, Arthur R. Renquist,* and *Roland W. Comstock,* for Northern States Power Company, amicus curiae.

*Charles A. Sawyer,* City Attorney of Minneapolis, *Harry Weinberg,* City Attorney of Duluth, and *Marshall Hurley,* City Attorney of St. Paul, for said cities, amici curiae.

*Garfield E. Lovaas,* for Northwestern Bell Telephone Company, amicus curiae.

MATSON, JUSTICE.

Defendant appeals from a summary judgment granted to plaintiff upon the pleadings and stipulated facts.

This action was initiated by plaintiff's petition asking for declaratory relief adjudging Ex. Sess. L. 1957, c. 4[1] (hereinafter referred to as the Reimbursement Act), to be constitutional, and further praying for a peremptory writ of mandamus to compel the defendant, as commissioner of highways for the State of Minnesota, (a) to ascertain, as required by said act, the cost of relocating plaintiff's utility facilities, (b) to certify

---

[1]Otherwise designated as M. S. A. 161.131 to 161.135.

the cost thereof to the Bureau of Public Roads, and (c) to pay the same out of state highway funds in a sum which shall not exceed the amount on which the Federal government bases its reimbursement to the state for such relocation.

This case arises out of Minnesota's participation in the Federal road building program authorized by the Federal-Aid Highway Act. The crux of the litigation involves the validity of an act passed by the 1957 legislature which purports to authorize the state to pay from highway funds the cost of relocating utility facilities on Federal-aid roads subject, however, to a 90-percent reimbursement from Federal funds.

Plaintiff, a "utility" as defined in the Reimbursement Act, is a private corporation engaged primarily in purchasing, distributing, and selling natural gas in Minneapolis and surrounding communities. The Reimbursement Act (Ex. Sess. L. 1957, c. 4) was enacted by the Minnesota legislature to implement a provision of the Federal-Aid Highway Act of 1956, 70 Stat. 383, 23 USCA, § 162, which provides for the payment to utilities of the nonbetterment cost[2] of relocating their facilities when such relocation is made necessary in furtherance of the Federal road construction program.

The Federal-Aid Highway Act[3] enacted by Congress in 1956 creates a network of 41,000 miles of interstate and defense highways to be constructed by the several states, but paid for by Federal funds in the minimum amount of 90 percent of the total construction cost. As a part of the construction cost, the Federal act specifically provides that a utility—whether publicly, privately, or cooperatively owned[4]—which, in the course of such highway construction, is required to change the

---

[2]Nonbetterment cost is the net cost after deducting any increase in the value of the new facility and any salvage value derived from the old facility. See, Ex. Sess. L. 1957, c. 4, § 2.

[3]70 Stat. 374, 23 USCA, § 151, et seq.

[4]70 Stat. 383, 23 USCA, § 162(b); see, Ex. Sess. L. 1957, c. 4, § 2, subd. 3, which provides:

" 'Utility' means all publicly, privately, and cooperatively owned systems for supplying power, light, gas, telegraph, telephone, water, pipeline or sewer service *if such systems be authorized by law to use public highways for the location of its facilities."* (Italics supplied.)

location of any of its facilities on the right-of-way shall be paid the nonbetterment cost[5] of such relocation out of Federal funds *provided the state initially makes the payment to the utility in accord with 70 Stat. 383, 23 USCA, § 162(a) of the Federal act* which reads:

"(a) Subject to the conditions contained in this section, *whenever a State shall pay for the cost of relocation of utility facilities* necessitated by the construction of a project on the Federal-aid primary or secondary systems or on the Interstate System, including extensions thereof within urban areas, *Federal funds may be used to reimburse the State for such cost in the same proportion* as Federal funds are expended on the project: *Provided, That Federal funds shall not be apportioned to the States under this section when the payment to the utility violates the law of the State or violates a legal contract between the utility and the State."* (Italics supplied.)

Many states, in order to qualify for Federal reimbursement for relocation costs upon Federal-aid highways within their borders, have found it necessary to enact enabling legislation to meet the conditions and terms prescribed by Congress. This has been true of Minnesota. Our state legislature, in recognition of this need, passed the Reimbursement Act (Ex. Sess. L. 1957, c. 4) to implement the above-quoted provision of the Federal-Aid Highway Act of 1956. In so far as here immediately pertinent, the Reimbursement Act provides:

"Sec. 5. Whenever the commissioner of highways shall determine that the relocation of any utility facility is necessitated by the construction of a project on the routes of *federally-aided state trunk highways,* including urban extensions thereof, which routes are included within the National System of Interstate Highways, the owner or operator of such utility facility shall relocate the same in accordance with the order of the commissioner. After the completion of such relocation the cost

---

[5]The nonbetterment cost referred to herein is the cost as defined by 70 Stat. 383, 23 USCA, § 162(c), as follows:

"(c) For the purposes of this section, the term 'cost of relocation' shall include the entire amount paid by such utility properly attributable to such relocation after deducting therefrom any increase in the value of the new facility and any salvage value derived from the old facility."

thereof shall be ascertained and paid by the state out of trunk highway funds; provided, however, *the amount to be paid by the state for such reimbursement shall not exceed the amount on which the federal government bases its reimbursement for said interstate system.*

"Sec. 6. There is hereby appropriated out of the trunk highway fund a sum of money sufficient to carry out the provisions of this act." (Italics supplied.)

Prior to the enactment of Ex. Sess. L. 1957, c. 4, plaintiff, as a public utility, occupied with its gas mains the rights-of-way of Trunk Highways Nos. 394 and 65 (now designated as Interstate Highway No. 394) under a written permit issued by the commissioner of highways for the state. Under the terms of the permit plaintiff agreed that, in the event the state deemed it necessary to make any improvements or changes on all or any part of the right-of-way occupied by its gas mains, it would, *without any cost whatsoever to the State of Minnesota,* alter, change, vacate, or remove from the trunk highway right-of-way said gas mains so as to conform to such road changes or improvements. Absent the 1957 act, clearly the state would be under no legal obligation to reimburse the plaintiff, or any other similarly situated utility, for such relocation costs.

In May 1957, defendant, as state commissioner of highways, notified plaintiff that impending Federal-aid highway construction would require relocation of its gas mains on what had been Trunk Highway No. 65. Pursuant to regulations issued by the U. S. Public Roads Administration,[6] and subject to the terms of the Federal act, as implemented by the Reimbursement Act, defendant, acting on behalf of the State of Minnesota, on July 2, 1957, entered into a written agreement with the plaintiff whereby the latter agreed to relocate its gas mains at an estimated cost of $17,068.10 and the state agreed to determine the allowable nonbetterment cost thereof and to reimburse plaintiff therefor *but only in a sum which in no event exceeds the amount on which the Federal government bases its reimbursement (90 percent) to the state of the cost of such relocation.* This agreement was approved by the

---

[6]See, General Administrative Memorandum No. 300 of U. S. Public Roads Administration (Federal Works Agency) dated May 1, 1946.

division engineer of the U. S. Public Roads Administration, subject to the following condition:

"There will be no Federal-aid participation in this agreement until the State can certify that payment by the State to the Minneapolis Gas Co. of utility relocation costs *provided therein does not violate the law of the State or a legal contract with the Gas Company* in existence at the time the project was approved for Federal participation. * * * this certificate must be supported by an Attorney General's opinion or court decision clearly defining the State's liability under Section 5, of Chapter 4, Minnesota Special Session Laws of 1957." (Italics supplied.)

Plaintiff relocated its facilities as ordered by defendant and in January 1958 delivered to defendant an itemized statement of the nonbetterment cost of relocating its facilities in accordance with the general administrative memorandum of the Public Roads Administration and as provided in the agreement between the parties. Plaintiff requested defendant to determine the cost of relocation and to reimburse plaintiff. This defendant has refused to do. The parties have stipulated, in addition to the foregoing, that if plaintiff is entitled to reimbursement under Minnesota law all conditions precedent on plaintiff's part to its reimbursement have been performed; that since January 10, 1958, there have been sufficient funds in the trunk highway fund to pay all obligations due and owing against the fund.

Pursuant to plaintiff's motion for summary judgment, the district court, upon the pleadings and upon stipulated facts, made its findings and concluded as a matter of law that the Reimbursement Act is in all respects constitutional and ordered judgment for the plaintiff. Defendant appeals from the summary judgment.

This appeal presents issues as to whether the Reimbursement Act:

1. Violates Minn. Const. art. 16, §§ 2 and 6, by diverting funds for a nonhighway purpose?

2. Violates Minn. Const. art. 9, §§ 1 and 10, by authorizing the expenditure of funds for a private purpose?

3. Violates Minn. Const. art. 9, § 5, by contracting debts for works of internal improvement?

4. Violates Minn. Const. art. 4, § 33, by granting to a corporation

a special or exclusive privilege, immunity, or franchise?

5. Violates U. S. Const. art. I, § 10, and Minn. Const. art. 1, § 11, by impairing the obligation of a contract?

## No Diversion of Highway Funds for Nonhighway Purposes

■ Minn. Const. art. 16, § 6, adopted in 1956, creates a trunk highway fund *which shall be used solely for the purposes specified in § 2* of the same article which declares:

"There is hereby created a trunk highway system which shall be established, located, constructed, reconstructed, improved and maintained as public highways by the state. * * *"

The two foregoing sections taken together constitute the sole constitutional limitation on the use of trunk highway funds. The issue is, then, whether the nonbetterment cost of relocating a utility facility, necessitated by the construction of an interstate and defense highway, is within the highway purposes enumerated in art. 16, § 2. In resolving that issue, it is of course immaterial whether the utility has theretofore had an uncompensable duty at common law to relocate its facilities. If it once appears that an expenditure is made for a proper highway purpose, it is of no consequence that such an expenditure has never been made in the past.

Significantly, art. 16, §§ 2 and 6, are of broad import and do not of themselves define the functional use of a public highway or what constitutes proper construction, reconstruction, improvement, and highway maintenance costs. In the absence of qualifying or restrictive language, these constitutional provisions are not to be construed as expressing an intent to limit the expenditure of funds thereunder to only one, or less than all, of the purposes for which highways exist in our society of today. The concept of the functional uses or purposes of a highway has constantly expanded with the advancement of civilization until today a highway no longer exists for the limited, though principal, purpose of vehicular travel or transportation of persons and property over its surface. Sixty-three years ago,—in passing on the variety and extent of uses for which a highway easement had been acquired, and in specifically holding that the easement embraced the erection of

telephone lines[7]—this court, in Cater v. Northwestern Tel. Exch. Co. 60 Minn. 539, 543, 63 N. W. 111, 112, speaking through the clear-thinking and farseeing Mr. Justice Mitchell, said:

"* * * Hence it has become settled law that the easement is not limited to the particular methods of use in vogue when the easement was acquired, but includes all new and improved methods, the utility and general convenience of which may afterwards be discovered and developed in aid of the general purpose for which highways are designed. * * * Another proposition, which we believe to be sound, is that *the public easement in a highway is not limited to travel or transportation of persons or property in movable vehicles*. This is, doubtless, the principal and most necessary use of highways, and in a less advanced state of society was the only known use, as the etymology of the word 'way' indicates. * * * *But it is now universally conceded that urban highways may be used for constructing sewers and laying pipes for the transmission of gas, water, and the like for public use. * * * The uses referred to of urban streets are not in aid of travel, but are themselves independent and primary uses, although all within the general purpose for which highways are designed. Neither can a distinction between urban and rural ways be sustained* on the ground that such uses were contemplated when the public easement was acquired in the former but not when the easement was acquired in the latter * * *.

"* * * In our judgment, public highways, *whether urban or rural,* are designed as avenues of communication; and, if the original conception of a highway was limited to travel and transportation of property in movable vehicles, it was because these were the only modes of communication then known; that as civilization advances, and new and improved methods of communication and transportation are developed, these are all in aid of and within the general purpose for which highways are designed." (Italics supplied.)

■  Clearly since the Cater decision in 1895, Minnesota has been

---

[7]As early as 1860 the legislature gave telegraph companies the right to erect poles on the public roads and highways of the state. L. 1860, c. 12, § 1. Subsequently, the right of occupancy was given to other utilities. See, M. S. A. 222.37.

definitely committed to the view that the use of rights-of-way by utilities for locating their facilities is one of the proper and primary purposes for which highways are designed even though their principal use is for travel and the transportation of persons and property. Furthermore, the import of that decision is a clear recognition that the use of highway rights-of-way for the transmission of public intelligence and public utility services confers important and direct benefits upon the public and that such use is not solely for the benefit and convenience of the utilities. The soundness of the view that the placing of utility facilities upon a right-of-way is one of the proper uses of a highway benefiting the public is emphasized by the fact that convenience and economy result therefrom to utility users, who are usually located near highways, and by the further fact that, it is in the interest of the public welfare—in the view of our ever-increasing population—to make full and efficient use of the land surface occupied by public roads.

In view of the fact that the transmission of utility services is one of the general and primary purposes for which highways are designed, it would be unrealistic to construe the broad language of Minn. Const. art. 16, §§ 2 and 6, so narrowly as to prohibit the legislature from authorizing the use of highway funds for the nonbetterment location of utility services as a proper cost of highway construction, reconstruction, improvement, and maintenance. It would be unreasonable to hold that the proceeds of the highway fund may not be expended for whatever is reasonably necessary to the complete accomplishment of all the basic purposes for which a highway exists.[8] If we were to conclude otherwise we would not only disregard the broad language of the constitution but also the principle that, since an act is presumed to be constitutional, it will not be declared unconstitutional unless its invalidity appears clearly or unless it is shown beyond a reasonable doubt that it violates some constitutional provision. The power of the court to declare a law unconstitutional is to be exercised only when absolutely necessary in the particular case and then with great caution.[9]

[8]See, 40 C. J. S., Highways, § 176h(2)(a).

[9]Dimke v. Finke, 209 Minn. 29, 32, 295 N. W. 75, 78; State ex rel. Hildebrandt v. Fitzgerald, 117 Minn. 192, 134 N. W. 728; Reed v.

It is nothing new for the state not only to recognize that public service installations are an integral part of the highway (M. S. A. 222.37) but also—as it is admitted—to find it proper, as it has done on various occasions, to reimburse municipalities out of the highway fund for the cost of relocating their utility facilities. In fact the state has heretofore also paid from the highway fund the cost of relocating railroad crossings to the extent that such relocation has not benefited the railroads. §§ 161.03, subd. 1, and 219.40. The right of railroads to reimbursement out of the highway fund for the nonbetterment cost of relocating railroad crossings has been recognized despite the fact that railroads do not have the same right to occupy highways as do other utilities. (Compare §§ 222.37, 161.03, subd. 1, 222.26, and 219.40.) The principle which justifies the reimbursement of railroads for relocation costs is equally applicable to other utilities which occupy our highways. Although these prior acts of reimbursement do not establish their validity under the constitution, they are, however, a persuasive recognition that nonbetterment relocation costs are a normal and necessary part of highway construction and reconstruction costs.[10]

Although we have not heretofore had occasion to consider the re-

Bjornson, 191 Minn. 254, 253 N. W. 102; Muller v. Theo. Hamm Brewing Co. 197 Minn. 608, 268 N. W. 204; State v. Fairmont Creamery Co. 162 Minn. 146, 202 N. W. 714, 42 A. L. R. 548; First Nat. Bank of Boston v. Maine Turnpike Authority, 153 Me. 131, 136 A. (2d) 699, 721; 17 Dunnell, Dig. (3 ed.) §§ 8929, 8930, and 8931.

[10]Significantly, many state legislatures by their enactments have expressly found that relocation expenses are an integral part of the cost of highway construction. See, Alabama Code 1940 (1955 Supp.) Title 23, § 124(16)(e); Florida Stat. 1957, § 340.07(5); Illinois Smith-Hurd Stat. Ann. (1957 Supp.) c. 121, § 314a34; Indiana Burns' Stat. Ann. (1957 Supp.) § 36-3206: Kansas General Stat. (1957 Supp.) § 68-2005; Kentucky Rev. Stat. § 177.430(5); Louisiana Rev. Stat. (1957 Supp.) Title 48, § 1256E; Maryland Ann. Code 1957, Art. 89B, § 126E; Michigan Stat. Ann. (1957 Supp.) § 9.1095(5); New Jersey Stat. Ann. (1957 Supp.) Title 27, § 12B-6; North Carolina General Stat. § 136-89.18; Ohio Page's Rev. Code, § 5537.05; Rhode Island General Laws 1956, § 24-12-9(q); Texas Vernon's Civil Stat. Ann. (1957 Supp.) Art. 6674v, § 6; Vermont Laws 1955, No. 270, § 4; Virginia Code 1950, § 33-255.6.

location cost issue, our conclusion that art. 16 is to be given a broad, and not a strict, construction which justifies the payment of such costs out of the highway fund is justified by a number of prior decisions in which we have approved the payment of expenses which were reasonably related to the construction and maintenance of highways. We have held a legislative act valid which appropriated money from the highway fund to defray the costs of issuing motor vehicle licenses and of collecting the license fees;[11] further that an appropriation of such money to the state auditor, treasurer, civil service commission, and the commissioner of administration, to defray expenses of services reasonably attributable to highway matters is valid;[12] and that a similar appropriation to reimburse the general fund for services rendered the trunk highway fund by the commissioner of taxation is likewise valid.[13]

RELOCATION COSTS ARE VALID EXPENDITURES FOR A PUBLIC PURPOSE

■ Does the Reimbursement Act violate Minn. Const. art. 9, §§ 1 and 10, on the theory that it authorizes the expenditure of public funds for a private—as distinguished from a public—purpose? Minn. Const. art. 9, in so far as here pertinent, provides:

"Section 1. * * * Taxes shall be * * * levied and collected for public purposes, * * *.

\* \* \* \* \*

"Sec. 10. The credit of the State shall never be given or loaned in aid of any individual, association or corporation, * * *."

Under the foregoing closely interrelated sections of art. 9,[14] public funds

---

[11] State ex rel. Holm v. King, 184 Minn. 250, 238 N. W. 334.

[12] Cory v. King, 214 Minn. 535, 8 N. W. (2d) 614.

[13] Cory v. King, 227 Minn. 551, 35 N. W. (2d) 807. For other pertinent cases dealing with art. 16 of our state constitution, see State ex rel. Chase v. Babcock, 175 Minn. 103, 220 N. W. 408; Regan v. Babcock, 196 Minn. 243, 264 N. W. 803; State, by Peterson, v. Werder, 200 Minn. 148, 273 N. W. 714. State ex rel. County of Ramsey v. Babcock, 186 Minn. 132, 242 N. W. 474, is not in point since that case turned on the construction of a section of the then art. 16 which does not appear in the present art. 16.

[14] See, Minnesota Sugar Co. v. Iverson, 91 Minn. 30, 35, 97 N. W. 454, 455.

derived from taxation may be spent only for a public purpose (§ 1) and this limitation is safeguarded against indirect erosion by the specific prohibition that the credit of the state shall never be given or loaned in aid of any individual, association, or corporation (§ 10). In short, public funds shall be used solely for public purposes and shall never be used, or incumbered by pledging the state's credit, in the furtherance of any private purpose or in the aid of any private individual or entity. In Visina v. Freeman, 252 Minn. 177, 184, 89 N. W. (2d) 635, 643, we said:

"* * * What is a 'public purpose' that will justify the expenditure of public money is not capable of a precise definition, but the courts generally construe it to mean such an activity as will serve as a benefit to the community as a body and which, at the same time, is directly related to the functions of government.

\*     \*     \*     \*     \*

"The mere fact that some private interest may derive an incidental benefit from the activity does not deprive the activity of its public nature if its primary purpose is public."

■ In the light of the above principles, is the authorization of payment out of the highway fund to reimburse a utility (whether it be private, cooperative, or municipal) for the nonbetterment cost of relocating its facilities upon a Federal highway an expenditure for a public purpose which is of primary benefit to the community as a body and which is related to the functions of government? Historically, the establishment and maintenance of highways has been considered a governmental function. Furthermore, Minn. Const. art. 16, in specifically authorizing the construction and maintenance of public highways by the state, unquestionably establishes road building for the public as a governmental function of benefit to the entire community. We have already pointed out that the use of rights-of-way by utilities for locating their facilities is one of the primary purposes for which highways are designed, even though their principal use is for public travel and transportation of persons and property. It follows that where it becomes reasonably necessary to relocate such utility facilities in order to improve the highway for public travel (and especially so, as to a highway designed

to facilitate interstate travel and commerce and to further the common defense) an expenditure of funds to effect such relocation is properly a governmental function exercised for a public purpose of primary benefit to the entire community. It is primarily for a public purpose not only because the relocation is made necessary in order to expedite public travel and transportation, but also for other substantial reasons. The realities of the situation are that the people of Minnesota would suffer economically if the state failed to take advantage of Federal aid made available to the privately and municipally owned utilities of this state under the Federal-Aid Highway Act of 1956, in 70 Stat. 383, 23 USCA, § 162. The Federal-aid program is to be financed out of Federal funds, presumably resulting from Federal taxes contributed in part by the people of this state. If the utilities located in this state must undertake relocation of their facilities without a right to reimbursement, their costs will be substantially increased and this in turn will be reflected in higher utility rates in Minnesota communities. Furthermore, to the extent that other states effectuate Federal aid to their utilities and Minnesota does not, the people of Minnesota will be paying Federal taxes which will benefit the people of the other states but which will not benefit the people of Minnesota. The resulting economic benefit to the people of Minnesota from an authorization of these expenditures is a benefit to the community as a whole.

That the Reimbursement Act, in authorizing the payment of non-betterment relocation costs from highway moneys and thus qualifying Minnesota for a 90-percent reimbursement from Federal funds, furthers a public purpose of benefit to the entire state was graphically illustrated in Department of Highways v. Pennsylvania P. U. Comm. 185 Pa. Super. 1, 8, 136 A. (2d) 473, 477, when the Pennsylvania court said:

"* * * Thus, if state 'A' receives from the federal government 90% of the cost of other utility relocations on inter-state highways because the policy of that state is to bear this cost, while state 'B' receives nothing from the federal government for utility relocations because its policy is not to bear this cost, the citizens of state 'B' will pay on their utility bills for utility relocations in their state, and will also pay in their federal gasoline tax for a part of the cost of relocating utilities in state 'A'."

Does the Reimbursement Act, however, confer upon plaintiff utility benefits which nullify our conclusion that payments under the act are primarily for a public purpose? At the outset, it is to be borne in mind that the act provides (Ex. Sess. L. 1957, c. 4, § 2, subd. 4):

" 'Cost of relocation' means the entire amount paid by such utility properly attributable to such relocation after deducting therefrom any increase in the value of the new facility and any salvage value derived from the old facility."

By virtue of the above definition a utility's right to reimbursement is limited strictly to nonbetterment costs. If the relocation benefits the utility by increasing the value of its facilities or produces any salvage values, such increase and salvage values must be deducted from the total relocation cost in order to establish the reimbursable costs. In this respect the utility derives no benefit—not even an incidental one—and is protected only from a net loss. The reimbursement merely restores plaintiff utility to the same position it was prior to the relocation of its facilities.

### No Gratuity Conferred in Violation of Constitution

■ It is argued, however, that since plaintiff utility, at common law and under the terms of the occupancy permits issued to it by the state, was entitled to no reimbursement and was solely responsible for all costs of relocating its facilities on the highway, the Reimbursement Act, in authorizing payment of such relocation costs from the highway fund, confers upon the plaintiff a gratuity of public moneys in violation of Minn. Const. art. 9, §§ 1 and 10. This argument ignores the well-established principle—followed by other jurisdictions with identical or similar constitutional provisions[15]—that, although gratuities and benevolences of public moneys in aid of private undertakings are prohibited, the state constitution does not prohibit the legislature from, by prospective action (that is by an enactment prior to the ordering of a relocation

---

[15]Lehigh Valley R. Co. v. Canal Board, 204 N. Y. 471, 97 N. E. 964; Oswego & Syracuse R. Co. v. State, 226 N. Y. 351, 124 N. E. 8; Department of Highways v. Pennsylvania P. U. Comm. 185 Pa. Super. 1, 136 A. (2d) 473.

of utility facilities or prior to the commencement of a great public work requiring such relocation), fixing the conditions of performance and making provisions for the future recognition of claims for damages founded on equity and justice, although such claims would otherwise be damnum absque injuria and unenforceable against the state.[16] Advance provisions for the recognition of anticipated relocation cost claims, founded on equity and justice, is ex gratia only in the sense that the constitution *does not require* the state to pay such costs.

In Oswego & Syracuse R. Co. v. State, 226 N. Y. 351, 124 N. E. 8, we have a case in which *a railroad had built its bridge pursuant to a permit issued by the state wherein it was provided that the railroad could be required to remove the bridge at its own expense.*[17] Mr. Justice Cardozo, speaking for a unanimous court, rejected the claim of the attorney general that reimbursement pursuant to the statute would violate a constitutional prohibition against gifts. In part, the court said (226 N. Y. 351, 356, 124 N. E. 8, 10):

"At the threshold stands a question of constitutional power. 'Neither the credit nor the money of the State shall be given or loaned to or in aid of any association, corporation or private undertaking.' (Constitution, art. 8, sec. 9). The state finds in this command a barrier to reimbursement. In the case of the Lehigh Valley Railroad Company, the same barrier was interposed (Lehigh Valley R. R. Co. v. Canal Board, supra). The court found it unreal. We did not deny the power of the legislature in the improvement of navigation to tear down bridges and other obstructions without requital for resulting loss [citing cases]. We held, however, that the legislature did not violate the Constitution in refusing to exert the full measure of its might. Mere gifts and benevolences in aid of private undertakings, the Constitution does prohibit

[16]We have not overlooked the case of Bybee v. City of Minneapolis, 208 Minn. 55, 292 N. W. 617, wherein it was held the city was unauthorized to sell bonds to alter a railroad bridge where common-law duty required the railroad to alter the bridge at its own expense. The Bybee case is distinguishable by the fact that no act of the state legislature had abrogated such common-law duty.

[17]See footnote 18, *infra,* in re Lehigh Valley R. Co. v. Canal Board, 204 N. Y. 471, 97 N. E. 964, involving obligation at common law.

[citing cases]. It does not prohibit the recognition of claims which have their roots in equity and justice [citing cases]. This is not a case where the legislature, after building the canal, has voted compensation retrospectively for the expenses of a private undertaking. We say that to exclude a problem, and not to suggest its answer. This is a case where the legislature, by action looking to the future, has defined the terms of equity and justice upon which it will go into an enterprise. In fixing these conditions, the legislature has a wide discretion [citing cases]."[18]

In commenting on the legislature's power to define the conditions upon which the state would enter upon a vast public construction program, the court said (226 N. Y. 351, 357, 124 N. E. 8, 10):

"* * * The state was about to execute a great public work. It saw that in the doing of that work there would be destruction of private property. Much of the damage would be *damnum absque injuria*. None the less it would be damage. The result would be inequality in the distribution of public burdens. Some would pay more dearly than others in proportion to benefits received. This inequality, the legislature, fixing in advance the conditions of the undertaking, had the power to correct. It might refuse to launch an enterprise at the price of hardship and oppression. There was power to destroy, and leave the loss where it might fall. There was also power to pay for the destruction, and thereby re-establish some uniformity of proportion between benefits and burdens. The question was for the legislature whether the equity of compensation was strong enough to merit recognition. We cannot hold it to be illusory."

### No Works of Internal Improvement Involved

■ The Reimbursement Act (Ex. Sess. L. 1957, c. 4) does not

---

[18]In the earlier case of Lehigh Valley R. Co. v. Canal Board, 204 N. Y. 471, 97 N. E. 964, the railroad was subject to a common-law obligation to relocate its bridges at its own expense, but this common-law obligation was abrogated by act of the New York legislature. Our own decision of Bybee v. City of Minneapolis, 208 Minn. 55, 292 N. W. 617, involved a common-law obligation which had not been rescinded or abrogated by a legislative enactment. See footnote 16, *supra*. Cf. State ex rel. City of St. Paul v. Minnesota T. Ry. Co. 80 Minn. 108, 83 N. W. 32, 50 L. R. A. 656.

violate Minn. Const. art. 9, § 5, which reads:

"* * * The state shall never contract any debts for works of internal improvements, or be a party in carrying on such works, *except as authorized by * * * Article 16 of this Constitution * * *.*" (Italics supplied.)

Aside from the obvious fact that the construction and maintenance of public highways under art. 16 is performed by the state in its sovereign capacity and in the discharge of its governmental functions,[19] highway construction work under art. 16 is clearly and expressly excepted from the prohibition against engaging in works of public improvement. This disposes of the internal improvement issue.

NOT A SPECIAL LAW CONTRARY TO MINN. CONST. ART. 4, § 33

■ Does the Reimbursement Act, however, contravene that part of Minn. Const. art. 4, § 33, which reads:

"* * * The legislature shall pass no local or special law * * * granting to any corporation, association or individual any special or exclusive privilege, immunity or franchise whatever, or authorizing public taxation for a private purpose."

Defendant asserts that the Reimbursement Act is invalid as a special law because it selects for special benefit a part of a larger class and the resulting classification is neither related to the subject of the legislation nor necessary to accomplish its purpose. Basic to a consideration of this contention is the principle that this court will not interfere with the legislature's classification unless it is so manifestly arbitrary as to evince a purpose of evading the constitution.[20] In Visina v. Freeman, 252

---

[19]See, Visina v. Freeman, 252 Minn. 177, 89 N. W. (2d) 635; Naftalin v. King, 252 Minn. 381, 90 N. W. (2d) 185; Erickson v. King, 218 Minn. 98, 15 N. W. (2d) 201; Lipinski v. Gould, 173 Minn. 559, 218 N. W. 123, 730; State ex rel. Smith v. Van Reed, 125 Minn. 194, 145 N. W. 967; 17 Dunnell, Dig. (3 ed.) § 8830.

[20]See, Visina v. Freeman, 252 Minn. 177, 89 N. W. (2d) 635; Town of Bridgie v. County of Koochiching, 227 Minn. 320, 35 N. W. (2d) 537; State ex rel. Flaten v. Independent School Dist. 143 Minn. 433, 174 N. W. 414; State ex rel. Anderson v. Sullivan, 72 Minn. 126, 75 N. W. 8.

Minn. 177, 196, 89 N. W. (2d) 635, 651, we summarized the features which distinguish a general law from a special law by saying:

"(1) A law is general when it is uniform in its operation even though it divides the subjects of its operation into classes and applies different rules to different classes. It need not operate alike upon all the inhabitants of the state, or all the cities, or all the villages in the state.

"(2) A law is general in the constitutional sense which applies to and operates uniformly upon all members of any class of persons, places, or things requiring legislation peculiar to itself in matters covered by the law.

"(3) A special law is one which relates and applies to particular members of a class, either particularized by the express terms of the act or separated by any method of selection from the whole class to which the law might, but for such limitation, be applicable.

"(4) The classification must be based upon 'substantial distinctions' —those which make one class really different from another. The distinction must be based 'upon some natural reason,—some reason suggested by necessity, by some difference in the situation and circumstances of the subjects placed in the different classes, suggesting the necessity of different legislation with respect to them.'

"(5) The classification must be germane to the purpose of the law; that is, there must be an evident connection between the distinctive features to be regulated and the regulations adopted.

"(6) To whatever class the law applies, it must apply to every member of that class; that is to say, it must treat all alike who are similarly situated; 'all who are brought within its influence, but in its classification it must bring within its influence all who are under the same conditions.'

"(7) One alone may constitute a class as well as many, but the fewer there are in a class the more closely will courts scrutinize an act to see if its classification constitutes an evasion of the constitution."

Applying the foregoing principles we hold that the Reimbursement Act does not violate Minn. Const. art. 4, § 33. The Reimbursement Act authorizes the reimbursement of utilities for relocation of any utility facility necessitated by "a project on the routes of federally-aided state

trunk highways, including urban extensions thereof, which routes are included within the national system of interstate highways." M. S. A. 161.134. Classification of these routes separately from other routes of the trunk highway system is based upon substantial distinctions which make this class of highways different from the others. The distinction is based on differences in the circumstances of interstate and defense highways as compared to other highways which suggest the necessity of different legislation with respect to them. The classification made in the Reimbursement Act is germane to the purpose of that law, which was to obtain for the citizens of Minnesota the full benefits accruing from Federal legislation and from being connected with a national system of interstate and defense highways.

### NO IMPAIRMENT OF CONTRACT IN VIOLATION OF CONSTITUTION

It is finally contended that the Reimbursement Act impairs the obligation of contracts within the prohibition of U. S. Const. art. I, § 10, and Minn. Const. art. 1, § 11. There is no merit in this contention for two reasons. In the first place, the preexisting contract established by plaintiff's applications to occupy the right-of-way and the occupancy permits issued by the state, created a contractual relation between two parties, the state and the plaintiff. No third parties have acquired any rights under or pursuant to the contract. It is elementary that where all parties to a contract mutually agree, by conduct or express words, to amend, rescind, or abrogate a contract, in whole or in part, such mutual action does not impair the obligation of contract within the prohibitory clauses of either the Federal or state constitutions. Initially the contract was entered into in behalf of the state by the commissioner of highways. Thereafter, the legislature—which is the highest representative authority through which the state can act[21]—had the power by statutory enactment to amend the contract with the other contracting party's consent where no rights of third parties had in the meantime intervened. It is also well recognized that, if an administrative agency has entered into a contract as an agent of the state, the state (as the principal) may consent to release the other party from part or all of its obligations

---

[21]Naftalin v. King, 252 Minn. 381, 389, 90 N. W. (2d) 185, 191.

thereunder.[22]

In the second place, there is no impairment of the obligation of contract since all contracts made by the state are entered into subject to the implied condition that they are ever subordinate to a reasonable and proper exercise of the state's inalienable police power.[23] The relocation, construction, or reconstruction of highways clearly relates to the safety, security, and general welfare of the citizens of the state, and all steps taken in furtherance of these objects—inclusive of the relocation of utility facilities upon rights-of-way—are matters within the police power of the state. It is immaterial that a Federal-aid highway is involved. The judicial construction of Federal-aid legislation has consistently been that the mere fact the United States contributes to or assists states in the building of roads does not take from or limit the states in the exercise of their police power or the right to control and regulate the use of their roads.[24]

The Reimbursement Act (Ex. Sess. L. 1957, c. 4) violates neither the state nor the Federal constitutions and is valid. The summary judgment of the trial court is affirmed.

Affirmed.

---

[22]Worcester v. Street Ry. Co. 196 U. S. 539, 25 S. Ct. 327, 49 L. ed. 591; Western States Utilities Co. v. City of Waseca, 242 Minn. 302, 65 N. W. (2d) 255; State ex rel. Tri-State Tel. & Tel. Co. v. Holm, 138 Minn. 281, 164 N. W. 989; State ex rel. City of St. Paul v. Minneapolis, St. P. & S. S. M. Ry. Co. 190 Minn. 162, 251 N. W. 275.

[23]Naftalin v. King, 252 Minn. 381, 90 N. W. (2d) 185; First Nat. Bank of Boston v. Maine Turnpike Authority, 153 Me. 131, 136 A. (2d) 699, 712; Department of Highways v. Pennsylvania P. U. Comm. 185 Pa. Super. 1, 136 A. (2d) 473; Southern Bell Tel. & Tel. Co. v. Commonwealth (Ky.) 266 S. W. (2d) 308, 311; 3 Dunnell, Dig. (3 ed.) § 1603, p. 460.

[24]Southern Bell Tel. & Tel. Co. v. Commonwealth (Ky.) 266 S. W. (2d) 308, 311; South Carolina Highway Dept. v. Barnwell Bros. 303 U. S. 177, 58 S. Ct. 510, 82 L. ed. 734.