231 P.3d 932

**CITY OF CHANDLER, an Arizona municipal corporation, Plaintiff/Appellant,**

v.

**ARIZONA DEPARTMENT OF TRANSPORTATION, an Agency of the State of Arizona, Defendant/Appellee.**

**No. 1 CA–CV 09–0392.**

Court of Appeals of Arizona, Division 1, Department A.

May 20, 2010.

Mary Wade, Chandler City Attorney by James R. Cairns, Assistant City Attorney, Chandler, Attorneys for Plaintiff/Appellant.

Terry Goddard, Attorney General by James R. Redpath, Assistant Attorney General, Ron J. Aschenbach, Assistant Attorney General, Phoenix, Attorneys for Defendant/Appellee.

## OPINION

PORTLEY, Judge.

¶ 1 This opinion addresses whether Plaintiff City of Chandler (the "City") is required, as the trial court found, to pay the costs of relocating its utility lines under a roadway that had been dedicated to the public. The City challenges the entry of summary judgment in favor of Defendant Arizona Department of Transportation ("ADOT"). For the following reasons, we affirm the judgment of the trial court.

## BACKGROUND AND PROCEDURAL HISTORY

¶ 2 The City owns several water and sewer utility lines under McQueen and Willis Roads in an unincorporated portion of Maricopa County (the "County"). Segments of the utility lines needed to be relocated in order to construct a portion of the Loop 202 Santan Freeway and an interchange at McQueen Road. Both ADOT and the City thought the other should be responsible for relocation costs. To avoid any delay in construction, however, the parties agreed that the City would advance the costs, and ADOT would reimburse the funds if the City prevailed in subsequent litigation.

¶ 3 The City sued ADOT on June 23, 2003, and sought a declaration that ADOT was required to reimburse it for the relocation costs. The City alleged that it had prior rights in the property, and, alternatively, that it had acquired a prescriptive easement to use the property for its utilities.

¶ 4 Both parties moved for summary judgment in June 2008. After oral argument, the trial court concluded that "[the City] did not have prior rights against Maricopa County or ADOT," and granted ADOT's motion. After the court entered a signed judgment on May 5, 2009, the City appealed. We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") sections 12–120.21 and –2101(B) (2003).

## DISCUSSION

¶ 5 The City argues that the trial court erred because it, not ADOT, was entitled to summary judgment. We review a grant of summary judgment de novo and view the facts in the light most favorable to the non-moving party. *Andrews v. Blake,* 205 Ariz. 236, 240, ¶ 12, 69 P.3d 7, 11 (2003). Summary judgment is appropriate "if the pleadings, deposition, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ariz. R. Civ. P. 56(c)(1). The determination of whether a genuine issue of material fact exists is based on the record made in the trial court. *Phoenix Baptist Hosp. & Med. Ctr., Inc. v. Aiken,* 179 Ariz. 289, 292, 877 P.2d 1345, 1348 (App. 1994).

### A. Maricopa County's Property Interest

¶ 6 We begin by considering the specifics of the property interest the County, on behalf of the State, acquired in the pertinent roadways. The facts relevant to this inquiry are uncontested.

¶ 7 The Mesa Improvement Company was formed on November 11, 1904, to "reclaim, improve and develop lands for purposes of colonization, farming, stock raising, sale or other purposes." The company changed its name to the Chandler Improvement Company on January 8, 1913.

¶ 8 Between 1913 and 1917, the Chandler Improvement Company deeded six properties in the vicinity of what is now the intersection of McQueen and Willis Roads to private parties. The deeds conveyed the

parcels subject to limitations that allowed for the establishment of a north-south road (McQueen) and an east-west road (Willis). Although the language used in each deed was slightly different, each conveyance "except[ed] thirty-three (33) feet on [the section lines] for road purposes." [1] The County subsequently recorded plats for Willis and McQueen Roads, and the Board of Supervisors declared the resulting sixty-six-foot rights-of-way as public highways in 1917.

¶ 9 "Dedication is the intentional appropriation of land by the owner to some proper public use." *Allied Am. Inv. Co. v. Pettit*, 65 Ariz. 283, 287, 179 P.2d 437, 439 (1947) (citations omitted). Property may be dedicated pursuant to statute (a statutory dedication) or by action of the common law (a common law dedication). *Pleak v. Entrada Prop. Owners' Ass'n*, 207 Ariz. 418, 420–21, ¶¶ 6, 8, 87 P.3d 831, 833–34 (2004). Whether by common law or by statute, a dedication, once perfected, is irrevocable. *Thorpe v. Clanton*, 10 Ariz. 94, 99–100, 85 P. 1061, 1062 (1906).

¶ 10 The doctrine of common law dedication has long been applied to roadway easements for public use in Arizona. *See Pleak*, 207 Ariz. at 421, ¶ 9, 87 P.3d at 834. To be effective, a dedication must include an offer by the landowner to dedicate, and acceptance by the general public. *Id.* at 423–24, ¶ 21, 87 P.3d at 836–37. "The general rule ... is [that] ... [n]either a written grant nor any particular words, ceremonies, or a form of conveyance, are necessary to render the act of dedicating land to public uses.... Anything which fully demonstrates the intention of the donor and the acceptance by the public works the effect." *Allied*, 65

Ariz. at 287, 179 P.2d at 439 (internal citation and quotation omitted). When a common law dedication occurs, the public acquires an easement to use the property for the specific purpose, but fee ownership remains with the dedicator. *Pleak*, 207 Ariz. at 421, ¶ 8, 87 P.3d at 834.

¶ 11 Here, we accept the parties' agreement that the conveyances resulted in common law dedications of portions of McQueen and Willis Roads. The parties do not dispute that valid offers to dedicate were evident from the deed language,[2] or that the County properly accepted the roadway dedications for the public benefit. Consequently, the County acquired roadway easements in the vicinity where the Willis and McQueen rights-of-way intersect.[3]

**B. Scope of the County's Easements**

¶ 12 The City argues that, by virtue of the common law dedications, the County acquired "surface easement[s] to use the intersection property" with "fee title to that property remain[ing] with the private entit[ies] that dedicated the easement." The City contends that the County's easements "w[ere] limited to the traveling public's right to use McQueen and Willis Roads." Although the City correctly argues that the common law dedication does not result in fee ownership, the County's interest was not limited to a "surface easement."

¶ 13 Generally, a roadway easement includes any subsurface rights incident to use of the surface, such as a foundation for the surface or drainage systems, and substantial rights in the subsurface for purposes of utilities. *See City of Bisbee v. Ariz. Water Co.*, 214 Ariz. 368, 374–76, ¶¶ 15–27, 153 P.3d 389,

---

1. Some of the deeds stated that the excepted portion of land was "reserved for road purposes."

2. A street, "by its very nature [is] a public place, wherein all segments of the general public are expected to be able to use," *City of Scottsdale v. Mocho*, 8 Ariz.App. 146, 150, 444 P.2d 437, 441 (1968); and "[an] easement [that] consists of a roadway ... invites public use," *Hunt v. Richardson*, 216 Ariz. 114, 120, ¶ 17, 163 P.3d 1064, 1070 (App.2007). "Thus, when land is sold subject to a roadway easement[,] the usual burden of

proof is reversed and we presume an intent to dedicate the roadway to public use." *Kadlec v. Dorsey*, 223 Ariz. 330, 332, ¶ 7, 223 P.3d 674, 676 (App.2009).

3. Between 1958 and 1969, the County obtained an additional seven feet of right-of-way on each side of Willis and McQueen Roads. Some portions of the additional seven feet were acquired in fee by quitclaim deeds, while other portions were acquired by conveyance of roadway easements.

395–97 (App.2007) (holding that public policy prohibits the reservation of underground street rights for utility purposes when a property owner dedicates land for roadway purposes, and concluding that the term " 'streets' includes 'so much beneath the surface as is necessary for a foundation for the surface and for water mains, gas pipes, sewer pipes and conduits of various sorts.' " (quoting 10A Eugene McQuillin, *The Law of Municipal Corporations* § 30.06, at 237 (3d ed.1999))). Other jurisdictions have taken a similar position. *See Bentel v. Bannock County,* 104 Idaho 130, 656 P.2d 1383, 1386 (1983) (concluding that easements for public streets or roads "include, as a general matter, the right to install pipelines beneath the surface area of the road"); *Bolinger v. City of Bozeman,* 158 Mont. 507, 493 P.2d 1062, 1065–66 (1972) (holding that a public easement in a county road is not restricted to the use of the roadway for vehicular traffic, but may be used for constructing sewers and laying pipes for the transmission of gas, water, and the like for public use); *Minneapolis Gas Co. v. Zimmerman,* 253 Minn. 164, 91 N.W.2d 642, 649 (1958) (stating that "the use of rights-of-way by utilities for locating their facilities is one of the proper and primary purposes for which highways are designed even though their principal use i[s] for travel and the transportation of persons and property"); *Denver Circle R. Co. v. Nestor,* 10 Colo. 403, 15 P. 714, 722 (1887) (holding that the ordinary use of streets "includes such modes and means of passage upon and over the streets as are usual in cities, and such additional uses as the health and convenience of the city, in view of the extent of its population, may require; as the construction of sewers, the laying down of gas and water pipes, the grading and paving of the streets, and the like"); *Harlingen Irrigation Dist. Cameron County No. 1 v. Caprock Commc'ns Corp.,* 49 S.W.3d 520, 527 (Tex. App.2001) ("Roadway easements include the use of the subsurface for sewers, pipelines and other methods of transmission and communication that serve the public interest."); *Bivens v. Mobley,* 724 So.2d 458, 465, ¶ 29 (Miss.Ct.App.1998) (holding that the installation of a water line was within the scope of a roadway easement because an easement "for

ingress and egress to a tract on which a home is to be built means more than a surface roadway"—it also includes ingress and egress for other necessities).

¶ 14 By accepting the dedication from the Chandler Improvement Company, the County, on behalf of the State and the public, acquired all rights incident to roadway use, including substantial rights in the subsurface.

## C. The City Establishes Its Utilities

¶ 15 Although the McQueen and Willis intersection is outside the City's southern boundary, the City nevertheless placed the following utility lines near that intersection under the original sixty-six-foot rights-of-way between 1970 and 1997:(1) a twelve-inch water line running under Willis Road (1970); (2) a twelve-inch water line running under McQueen Road (1975); (3) a twenty-four-inch water line running under McQueen Road (1984); (4) a twenty-four-inch sewer line running under McQueen Road (1992); and (5) an eighteen-inch sewer force main running under McQueen Road (1997). The City did not secure formal permits from the County, nor did it contract with the County to place or operate the utilities. The City, however, received approval from the County Health Department on each utility line before starting construction, and there was no evidence that the County ever objected to the utility lines or the ongoing use of the subsurface.

## D. The Loop 202 and ADOT's Exercise of Rights

¶ 16 By resolution, ADOT established the Loop 202 as a state highway on or after March 16, 2001. Prior to construction, the State took control of the public property rights that the County had previously managed in the McQueen and Willis rights-of-way. *See* Ariz. Const. art. 13, § 6 (asserting that the state cannot be divested of its control over and regulation of public streets); A.R.S. § 11–251(4) (Supp.2009) (delegating to counties the power to "[l]ay out, maintain, control and manage public roads"); *El Paso Natural Gas Co. v. State,* 135 Ariz. 482, 483–84, 662 P.2d 157, 158–59 (App.1983) (holding that, when exercising control over public roads, counties or municipalities are "acting

as mere agents of the state"); *State v. Elec. Dist. No. 2,* 106 Ariz. 242, 244, 474 P.2d 833, 835 (1970) (stating that when the State takes county roads into the state road system, it acquires whatever property rights were held by the county). There is no dispute that ADOT, as an official agency of the State, was permitted to fully control and manage the public's property rights in the McQueen and Willis rights-of-way.

### E. Relocation Costs and Prior Rights

 ¶ 17 ADOT notified the City that its water and sewer lines needed to be relocated to permit the construction of an interchange[4] where the Loop 202 would intersect McQueen Road. As noted, the parties agreed to move forward with construction while they litigated which of them was responsible for the costs of relocating the utilities. The City claims that it is entitled to reimbursement because its utilities were present in the right-of-way before the Loop 202 came into existence; because there was no permit from, or contractual agreement with the County that limited its rights; and because it did not "rel[y] on the existence of a franchise right" when it placed its utilities. ADOT argues, however, that under Arizona common law, the City "is required to pay for its utility relocations regardless of whether a permit or any other agreement exists."[5] We agree with ADOT's argument.

 ¶ 18 Arizona recognizes the common law rule that "a public utility has the duty of relocating its lines when such is made necessary by street improvements." *Sanitary Dist. No. 1 v. State,* 1 Ariz.App. 45, 49, 399 P.2d 179, 183 (1965); *see also* A.R.S. § 40-283(A) (2001) (stating that the public is entitled to exercise continuing control over the use of public roadways in which transmission lines are placed); *Paradise Valley Water Co. v. Hart,* 96 Ariz. 361, 364, 395 P.2d 716, 718

(1964) (holding that "a ... county has the police power to require a utility to relocate its facilities at its own expense for road improvements made by the ... county"); *cf. El Paso Natural Gas Co.,* 135 Ariz. at 483, 662 P.2d at 158 (providing that "a public utility accepts franchise rights in public streets subject to an implied obligation to relocate its facilities at its own expense, when required for a necessary public use"); *Bisbee,* 214 Ariz. at 378, ¶ 36, 153 P.3d at 399 (citing rule set forth in *El Paso* ).

¶ 19 In *Sanitary District No. 1,* the State and Sanitary District No. 1 of Pima County ("the District") disputed who was responsible for the costs of relocating the District's sewer line caused by highway construction. 1 Ariz.App. at 46, 399 P.2d at 180. The State had acquired the right-of-way in which the sewer line was placed at some time prior to the sewer installation. *Id.* at 46–47, 399 P.2d at 180–81. Although the sewer construction was completed pursuant to a written permit, there was a dispute about whether the permit had expired, and whether there was any existing agreement between the parties. *Id.* at 47–49, 399 P.2d at 181–83. Even though we disagreed, we accepted the District's contention that the permit had expired for purposes of argument, but nevertheless concluded that the District was obligated to bear the relocation costs. *Id.* at 49–51, 399 P.2d at 183–85. We held that "[t]he law has been spelled out in this state that a public utility has the duty of relocating its lines when such is made necessary by street improvements." *Id.* at 49, 399 P.2d at 183. We also noted, in light of the fact that the District was not a private utility provider, that, "[i]nsofar as the duty to relocate water and/or sewer lines is concerned, ... a municipality is in no better position than a privately owned public utility." *Id.* at 49, 399 P.2d at 183 (citing supporting cases); *see also State ex rel. Albuquerque v. Lavender,* 69 N.M. 220, 365 P.2d

---

4. The interchange would permit traffic to flow through the intersection by using separate levels of traffic flow. A portion of McQueen Road was reconstructed as a bridge at its original elevation and the Loop 202 was constructed to pass underneath the bridge at a lower elevation. Additionally, the interchange provided exit and entrance ramps from and onto the Loop 202 at the intersection.

5. The parties raised a variety of arguments before the trial court on the issue of who is responsible for the relocation costs. We confine our review to whether summary judgment was properly granted in favor of ADOT.

652, 653–54 (1961) (stating that "the operation of water and sewer systems is a proprietary function of a municipality, not a governmental function, and therefore must stand on the same footing as privately owned utility facilities").

¶ 20 Finally, we discussed the single exception to the "general rule that a public utility has no vested right in maintaining a water or a sewer line in any particular location in a public highway." *Sanitary Dist. No. 1*, 1 Ariz.App. at 50, 399 P.2d at 184. "[W]here [the utility] line [is] there before the dedication of the street or the acquisition of the road by the public body making the road improvement," the public utility would have superior rights. *Id.; see also Elec. Dist. No. 2*, 106 Ariz. at 244, 474 P.2d at 835 (holding that where telephone utility infrastructure existed on private property before a public highway was properly established, the utility had superior rights and any necessary relocation costs must be paid by the State). Because it was clear in *Sanitary District No. 1* that the State had acquired the roadway right-of-way before the District installed its sewer line, we held that the exception was not applicable. 1 Ariz.App. at 50, 399 P.2d at 184.[6]

¶ 21 We recently reiterated these principles in *Bisbee*, holding that, even where a utility has no formally established franchise or formal contractual obligation to assume relocation costs, "[its] right in the surface or subsurface of public streets is subordinate to the public's right to health and safety and subject to the government's police power." 214 Ariz. at 379, ¶ 39, 153 P.3d at 400 ("That [Arizona Water Company's ("AWC")] rights in the streets heretofore were not formally established through a franchise and that AWC had no franchise or other contractual

obligation to pay for relocating its facilities [did] not relieve it of the common law obligation to assume the relocation costs."). In fact, we stated that "it is illogical that a public utility that is properly authorized by franchise to operate within a city would have greater obligations than a public utility that formerly has not been authorized through a franchise agreement." *Id.* For the same reason, we think it unwise to endorse any rule whereby a city could circumvent its obligations to pay for the relocation of its utilities by avoiding permit requirements or by intentionally placing utilities without full approval from the requisite governmental entity.

¶ 22 Here, ADOT's determination that a section of McQueen Road needed to be reconstructed as an interchange is a proper exercise of state police power. *See El Paso Natural Gas Co.*, 135 Ariz. at 483, 662 P.2d at 158 ("The relocation, construction, or reconstruction of highways clearly relates to the safety, security, and general welfare of the citizens of the state. It follows then, that all steps taken in furtherance thereof are matters within the police power of the state, as sovereign."). In the absence of an agreement to the contrary, the cost of relocating utility lines placed in the right-of-way of public streets must be paid by the owner of the utility when the relocation is necessitated by road maintenance or construction, unless the utility was in place before the public acquisition of the roadway. It is undisputed in this case, as in *Sanitary District No. 1*, that the public acquired rights in the McQueen right-of-way long before the utilities were placed. Therefore, the paramount right of the State to reconstruct McQueen Road to meet the changing needs of traffic is superior to the City's rights to have its utilities at a certain location in the right-of-way.[7]

---

6. In *Sanitary District No. 1*, we recognized the limitation that a regulatory body may not act in a "capricious unreasonable and/or discriminatory manner." 1 Ariz.App. at 50, 399 P.2d at 184. Although the City points to this as a way to distinguish the result in *Sanitary District No. 1* from this case, it failed to present any evidence or argument that such an exception would apply in this case.

7. The City argues that it could have annexed the area surrounding the McQueen and Willis inter-

section prior to the Loop 202 construction project, and that it therefore held a "beneficial interest" in the subject property. Even if it had annexed the area, it would not "own" the public roadways, but would merely manage them as an agent of the state. *See City of Mesa v. Salt River Project Agric. Improvement & Power Dist.*, 92 Ariz. 91, 102, 373 P.2d 722, 730 (1962) ("[A]ll powers of government are lodged in the people, exercised by the state subject to constitutional limitations. [A city] derives its powers from the

¶ 23 The fact that the Loop 202 was, relative to the City's rights, a new right-of-way on an alignment different from McQueen or Willis Roads does not change our conclusion. *See Sanitary Dist. No. 1,* 1 Ariz.App. at 45–51, 399 P.2d at 179–85 (holding that a utility owner was required to pay for relocation costs where a new freeway caused the need to construct an underpass for an intersecting roadway, despite the fact that it was construction on the intersecting roadway caused by the new freeway, and not construction on the roadway under which the utility line was laid, that necessitated the relocation); *cf. El Paso Natural Gas,* 135 Ariz. at 482–84, 662 P.2d at 157–59 (holding that a franchise agreement required a utility to pay for costs to relocate its utilities under a public road despite the fact that it was a new intersecting freeway and its attendant construction that caused the need to relocate the utilities). The fact remains that ADOT reasonably determined that a portion of McQueen Road, in which the State has superior rights, needed to be reconstructed in a way that was inconsistent with the City's utility lines. The City provides no basis for departing from established principles just because construction on a public road is necessitated by a new highway.[8]

¶ 24 Finally, the City insists that it acquired an independent prescriptive or implied easement against the fee owners in the right-of-way. The trial court concluded that

the argument was irrelevant to the analysis. We agree, and do not need to resolve the precise nature of property rights the City had, if any, except to recognize that whatever property rights it may have had were subject to the lawful and reasonable use of the police power of the State. *Sanitary Dist. No. 1,* 1 Ariz.App. at 50, 399 P.2d at 184 (noting the "general rule that a public utility has no vested right in maintaining a water or a sewer line in any particular location in a public highway").

¶ 25 The City argues that ADOT is constitutionally required to remit just compensation for taking its property rights. Relying on *New Orleans Gaslight Co. v. Drainage Comm'n of New Orleans,* 197 U.S. 453, 462, 25 S.Ct. 471, 49 L.Ed. 831 (1905), we recently held that, "[e]ven though a utility may have a property interest in a state franchise or its facilities, the utility cannot shield itself from relocation expenses by raising a taking claim so long as the municipal action is reasonable." *Qwest Corp. v. City of Chandler,* 222 Ariz. 474, 487, ¶ 46, 217 P.3d 424, 437 (App.2009) (noting that, in *New Orleans Gaslight,* the United States Supreme Court "expressly rejected a taking claim when the reasonable exercise of municipal power required a utility to relocate its facilities"). Because there was no argument or evidence that ADOT's actions were unreasonable, and

---

Constitution and the legislature and has only such powers as are expressly granted or can be reasonably implied therefrom.") (citations omitted). Additionally, the City provides no authority supporting the proposition that the analysis in this case should be different merely because the City *could have* annexed the land.

**8.** Like the trial court, we recognize that *County of Orange v. Santa Margarita Water Dist.,* 44 Cal.App.4th 189, 52 Cal.Rptr.2d 8 (1996), appears to support the City's position. In County of Orange, the Santa Margarita Water District owned water and sewer utility lines under a county highway that were placed pursuant to a county-issued encroachment permit. *Id.* at 9. The permit provided that the water district would remove and relocate its utilities, at its own expense, if they interfered with the "improvement" of the highway. *Id.* A joint powers agency, which included the county, built a regional transportation toll road which, similar to this case, intersected the county highway and passed

underneath the county road. *Id.* Like the present case, the construction required the relocation of the utility lines to permit the underpass construction. *Id.* Because the California appellate court found that the new toll road did not constitute an "improvement" to the intersecting county highway, it concluded that "the long-standing rule is: facilities that are 'prior in time' are 'prior in right.'" *Id.* at 11. Because the water district's facilities were "first in place," and because it was the toll road project which necessitated relocation of the utilities, the court concluded that the water district's utility rights were superior to the joint powers agency's rights to construct the toll road. *Id.*

ADOT attempts to distinguish *County of Orange* by arguing that the case turns on the fact that the utilities were placed pursuant to a permit, and because it was a regional authority that was constructing the new highway, rather than the state itself. Regardless, we think it proper, as did the trial court, to follow existing Arizona law, rather than California law.

because ADOT permitted the City to relocate its utilities, we conclude that the City has not suffered a compensable taking.

## CONCLUSION

¶ 26 For the foregoing reasons, we affirm the grant of summary judgment entered in favor of ADOT.

CONCURRING: LAWRENCE F. WINTHROP and MARGARET H. DOWNIE, Judges.