25 P.(2d) 204

**STATE v. HENRY.**

No. 3908.

Supreme Court of New Mexico.

Sept. 12, 1933.

E. K. Neumann, Atty. Gen., and Frank H. Patton, Asst. Atty. Gen., for the State.

John F. Simms, of Albuquerque, for appellee.

WATSON, Chief Justice.

This is an appeal by the state from an order quashing an information which charged that appellant, "being the * * * proprietor of a * * * mercantile establishment, to-wit, a drug store, did * * * cause a male employee, * * * a registered pharmacist, to work and labor in said mercantile establishment for more than eight hours in a certain twenty-four hour day, * * * the said work and labor * * * not having been performed in an emergency case. * * * "

The information is founded on Laws 1933, c. 149, which prohibits labor of male employees in mercantile establishments more than eight hours in a day or forty-eight hours in a week of six days.

The motion attacks the statute as repugnant to the due process clause of State and Federal Constitutions, in that it deprives both employer and employee of liberty of contract, and deprives the employee of his property right in his own labor. It further attacks it as violative of the equal protection clause of the Constitutions, in that the selection of mercantile establishments for such regulation is an arbitrary and unreasonable classification, not referable to the health, morals, or general welfare of the public or of the employers or employees thus restricted.

The learned trial judge, in sustaining the motion, rendered this brief opinion: "Ignoring the defects in grammar and language, we find the statute provides an eight hour day for 'mercantile establishments'. The selection of mercantile establishments for regulation seems to be an arbitrary one of the sort which has been held invalid by all of our courts from the Supreme Court of the United States down. Counsel have not been able to find any case sustaining such a classification, and I believe none exists. Labor in a mercantile establishment has no such relation to the public health, safety, morals, or general welfare as to set it apart from other occupations for the purpose of regulation. It is hard to see why hours of labor should be regulated in mercantile establishments and not in factories, laun-

dries, foundries, dairies, bakeries, building trades, garages, and the like. Had the legislature, in keeping with the social trend of the times, made a sweeping enactment of an eight hour day for all wage earners in the state, this court would have viewed it with great sympathy, but there appears no ground for ascribing validity to the present act."

Able counsel for appellee thus discusses the workings of the statute: "It will be noticed at the outset that this statute deals with *male* employees in *mercantile* establishments only. It makes no distinction as to the kinds of labor they perform. They may be bookkeepers, stenographers, clerks, drivers of delivery wagons, traveling salesmen or what not. The test sought to be applied is not *what they do* but *who they work for*. The proprietor of the business is not prohibited from working any number of hours he may choose. An employee who does exactly similar work for an employer who does not run a *mercantile establishment* is not prohibited from working any number of hours he may choose. A bookkeeper in a bank can work until midnight to balance accounts before the first of the month and be within the law; his brother who keeps books for a merchant next door will get his employer arrested if he does the same thing. Each may be working in surroundings exactly similar as to comfort, health and safety."

Broadly, the question is whether the statute is a legitimate exercise of police power, or whether it violates rights which the Constitution has protected as against legislative deprivation.

Appellant, the state, interprets the opinion as a holding "that the classification by the legislature was arbitrary and therefore violated the law," and says: "We assume the court had in mind the question of unwarranted discrimination." Inquiry is then directed to the question whether the act denies the equal protection of the laws to employers and employees of mercantile establishments; the legislative power to make reasonable classifications is invoked; and it is contended that the constitutional guaranty is not violated unless protection afforded to one is denied to another in like circumstances. This matter of classification, it is said, is primarily for the Legislature; the judicial function being merely to inquire whether it is clearly unreasonable, and to resolve all doubt in favor of the statute.

These general principles we do not question, nor the authorities cited in support of them. If the statute can be brought within the police power, it may be, or it may not be, that it would withstand the objection of discrimination or class legislation. That question we pass. Another precedes it. Is the act within the police power?

"Due process" is the test. It is dual; that of the Federal Constitution (Amendment 14), a limitation upon state powers; that of our own Bill of Rights (article 2, § 18), the people's limitation upon legislative power. Of the former, first.

The leading case cited by appellee is Lochner v. New York, 198 U. S. 45, 25 S. Ct. 539, 547, 49 L. Ed. 937, 3 Ann. Cas. 1133. There

a state statute limiting daily labor in bakeries to ten hours was held to violate due process. Four of the nine justices dissented. But all, except perhaps Mr. Justice Holmes, agreed in principle; the difference being one of fact, whether the nature of that employment was such that the law could be sustained as a health measure. This appears not only on the face of the opinions themselves, but from a later pronouncement by Mr. Justice Harlan, one of the dissenters, then speaking for the court. Adair v. U. S., 208 U. S. 161, 28 S. Ct. 277, 52 L. Ed. 436, 13 Ann. Cas. 764.

Our statute cannot be distinguished from the New York enactment to the legal advantage of the former. If this were the latest holding, we might well rest decision on such high authority. But we are reminded that law is a "progressive science," particularly in cases of this character. We shall not assume, in considering "general welfare" as the basis of police power, that 1905 is 1933.

The Lochner Case has been frequently distinguished. By statutes which have successfully resisted attack, numerous classes have suffered some impairment of liberty of contract, because, considering age, sex, the rigors or hazards of employment, or other matters, it was possible to relate the restriction to health, safety, morals, or other recognized object of legislative protection. As a precedent, it would now be an unsafe guide. But its importance as a leading case lies in the principles invoked, not in the particular application of them.

Not always, perhaps never, has the soundness of those principles been unanimously conceded in our highest court. Certain it is that there have always been jurists and scholars to challenge them. That they have so far survived can hardly be questioned. Many may contend that they should be overthrown. Few will be heard to claim that they have been.

The fundamental principles are these:

■ First. "Liberty" embraces a man's right to contract as he will or can regarding his hours of employment. He, not the government, is to determine the matter. To this extent individualism is in the Constitution. It may be that Mr. Justice Holmes was historically and scientifically right in opining that "a Constitution is not intended to embody a particular economic theory, whether of paternalism and the organic relation of the citizen to the state or of laissez faire." Lochner v. New York, supra. Rightly or wrongly, this intent and result are in the Constitution, according to judicial decision.

■ Second. "Due process," by which only the individual may be deprived of his liberty, does not have regard merely to *enforcement* of the law, but searches also the authority for *making* the law. An historical and scientific mistake may have been made in deviating from the more familiar idea that "due process" is matter of procedure only. Corwin, "The Supreme Court and the Fourteenth Amendment," 7 Mich. Law Rev. 643. Nevertheless, by judicial decision, the

first and fundamental step in the due process or procedure of depriving the individual of liberty is the enactment of a statute within legislative competency.

■■ Third. The guaranty is not merely directory to the Legislature, binding its conscience only; a political right. It constitutes a legal right, assertable in the courts, and to be protected and preserved unless the contrary right asserted be superior. · It is perhaps to be regretted that the early warning of Mr. Justice Miller against "a perpetual censorship of state legislation" (Slaughter House Cases, 16 Wall. 36, 21 L. Ed. 394) has not been heeded. There may be force in the suggestion that an undue sensitiveness of the courts to constitutional right tends to lessen that of the Legislature; the latter feeling that it may safely and rightly relieve itself of, and throw on the former, the responsibility, often the odium, of overruling the will of the majority, or the will of the organized and active minority. Learned Hand, "Due Process of Law and the Eight Hour Day," 21 Harv. Law Rev. 495. Yet, by judicial decision, a Legislature's assumption of the power is not controlling as to its existence, and the courts must inquire whether a police regulation infringing individual liberty is unreasonable, arbitrary, or capricious.

In a recent article entitled "The National Industrial Recovery Act," Professor Handler, of Columbia, suggests, as precedent for a possible overruling of the minimum wage decisions, "the Supreme Court's change of attitude toward the regulation of hours of labor which it now permits." In the footnote decisions are cited as "overruling Lochner v. New York." XIX Am. Bar. Ass'n. Journal, 440.

"Change of attitude" aptly expresses the matter. That consists, as we see it, in a greater deference to Legislatures as the originators of state policy and the guardians of general welfare, more latitude to the police power, greater caution in labeling regulatory statutes as unreasonable, arbitrary, or capricious. Of an overruling of the Lochner Case, in the sense of departure from any of the principles just enumerated, we do not find the evidence.

On the contrary, that decision, as the exponent of those principles, has been by the majority frequently reaffirmed, perhaps most emphatically and explicitly in Adkins v. Children's Hospital, 261 U. S. 525, 43 S. Ct. 394, 399, 67 L. Ed. 785, 24 A. L. R. 1238, decided in 1923. The dissenting opinions in that case emphasize the deliberation with which the majority approved those principles. Indeed, the dissenting opinion of Mr. Justice Brandeis, in New State Ice Company v. Liebmann, 285 U. S. 262, 52 S. Ct. 371, 76 L. Ed. 747, while involving liberty to engage in a calling, rather than liberty to contract for one's labor, is conclusive proof to our minds that the Lochner decision stands fundamentally as written.

Muller v. Oregon, 208 U. S. 412, 28 S. Ct. 324, 52 L. Ed. 551, 13 Ann. Cas. 957, and Bunting v. Oregon, 243 U. S. 426, 37 S. Ct.

435, 61 L. Ed. 830, Ann. Cas. 1918A, 1043, are perhaps most frequently mentioned as detracting from the Lochner decision.

In the Muller Case, the assurance by Mr. Justice Brewer, for once writing for an undivided court, that Lochner v. New York was not questioned in any respect, has not seemed to set the matter at rest. The distinction, whether sound or not, is plain. The Lochner Case involved adult males, as does our statute. The Muller decision involved females. In the latter case the general right of male adults to contract freely is not only assumed, but is taken as the point of departure. The argument merely goes to distinguish the case of females.

Somewhat curiously, Mr. Felix Frankfurter, after praising the "technique" of the Muller decision—presentation by counsel and consideration by the court of "authoritative data," scientific fact, and opinion disclosing the "state of the art," to establish the distinction—finally rejects that distinction as based on scientifically demonstrated falsity, and urges that "we cease to look upon the regulation of women as exceptional, as the law's graciousness to a disabled class, and shift the emphasis from the fact that they are *women* to the fact that it is *industry* and the relation of industry to the community, which is regulated." "Hours of Labor and Realism in Constitutional Law," 29 Harv. Law Rev. 353.

Muller v. Oregon may mark a shifting in *emphasis* "to community interests, the affirm-ative enhancement of the human values of the whole community—not merely society conceived of as independent individuals dealing at arms length with one another, in which legislation may only seek to protect individuals under disabilities, or prevent individual aggression in the interest of a countervailing individual freedom." Id. But long subsequent to the Muller decision and to Mr. Frankfurter's critique, in Adkins v. Children's Hospital, supra, the majority of the Supreme Court not only reaffirmed the Lochner decision in its principles, but subscribed to an apparent doubt of Mr. Justice Sutherland whether the Muller Case would not have resulted differently if it had arisen subsequent to the "revolutionary—changes * * * in the contractual, political, and civil status of women. * * *"

Bunting v. Oregon, supra, was thought by Mr. Chief Justice Taft, dissenting in the Adkins Case, to have overruled the Lochner Case sub silentio. It would be easy to fall into that view if the majority of that tribunal which may speak with authority and finality had not otherwise determined.

The court's disavowal is not enough, however, on which to dismiss the Bunting decision. While it did not vary the principles of the Lochner Case, it must still have consideration as precedent when attempting to apply those principles. A present assumption that the Adkins decision had overruled the Bunting Case would be no safer than the earlier assumption that the Bunting decision had overruled that of Lochner.

If Oregon could constitutionally restrict male adult labor in mills, factories, or manufacturing establishments to ten hours, why is not our statute equally within the police power? If the Supreme Court should be as deferent to the declared policy of this state as it was to that of Oregon, would it not sustain our statute?

There is of course a difference between a ten-hour working day and one of eight hours. It would be drawing a fine line, however, to hold it a legal distinction. The advance of opinion and practice toward shorter hours, in the sixteen elapsed years, may have absorbed some or all of the difference.

There is a difference between manufacturing and mercantile establishments. The Supreme Court of Oregon noticed it in its opinion. State v. Bunting, 71 Or. 259, 139 P. 731, L. R. A. 1917C, 1162, Ann. Cas. 1916C, 1003. It mentioned and relied somewhat upon the danger of accidents from excessive periods of toil "in factories where different kinds of machinery and facilities are operated under the present day high-pressure power." Danger from the monotonous repetition of a single operation might have been mentioned. Still, as respects health and safety, the differences within each of these classifications are perhaps as great as those between them. No general classification could perhaps be set up in which this regulation would be less needed than that of mercantile establishments. Embraced within it, however, is the employment of a pharmacist, having a direct relation to public safety, and which in California is held

subject to such regulation. In re Twing, 188 Cal. 261, 204 P. 1082.

The Legislature of Oregon was at pains to preface its enactment with a declaration that no person should be allowed to work for wages, under any conditions or terms, for longer hours or days of service than is consistent with his health and physical well-being and his ability to promote the general welfare by his increasing usefulness as a healthy and intelligent citizen, and that more than ten hours' daily labor in mill, factory, or manufacturing establishment is injurious to health and physical well-being and tends to prevent development of that degree of intelligence necessary to usefulness and desirability as a citizen. In the federal decision the majority gave some weight to this declaration or finding; how much is not disclosed.

It seems, also, that in the Bunting Case the principal attack by counsel was upon the proviso that employees might work overtime not to exceed three hours in one day on condition of payment by the employer of 50 per cent. additional for the overtime. This feature of the act, it was contended, disclosed that it was, in purpose and effect, a wage law rather than a health measure. The opinion is largely given over to refutation of that contention.

Practically, it is but a step from the Oregon statute to ours. It cannot be said with assurance that if our statute were legislatively labeled, as the Oregon statute was, as a health measure, and had the approval of this court as such, the federal tribunal would

invoke the distinctions between ten hours and eight hours, and between manufacturing and mercantile establishments, to strike it down.

Yet later decisions, notably the reaffirmance of principles in the Adkins Case, suggest that the high tide of deference to state policy and of permitted encroachment upon liberty of contract, in the matter of hours of employment, was reached in the Bunting Case. We consider the Oregon statute to have been upheld, not upon the ground, urged by its Supreme Court, that compulsory leisure tended to promote the general welfare by affording opportunity for intellectual improvement of the citizen as a voter, juror, and (in Oregon) legislator, but on the ground that its claim to be a health measure was not palpably false.

In our weighing of the federal authorities and question, where the scales are so delicately balanced as between the police power of the state and the federal guaranty of due process, we may easily be mistaken. If that were all, we might perhaps best sustain this exercise of state power, as did the Supreme Court of Oregon, leaving appellee to vindicate his right under the Fourteenth Amendment in that tribunal which must finally determine it.

But our responsibility does not here end. With us due process is a state question as well. In this we differ from Oregon. In 1910, we placed it in our Bill of Rights. There the individual's liberty and property are recognized and protected, side by side with his rights to trial by jury, to freedom of speech and of worship, and to be secure from unreasonable searches and seizures. We used the exact language of the Fourteenth Amendment. While, according to the well known principle, we did adopt, with the language, the interpretation it had received, and while we would naturally go with the federal tribunal in the development of the law of due process, still the federal question and the state question are not necessarily the same.

The circumstances under which Congress submitted and the states ratified the Fourteenth Amendment are quite different from those under which the people of New Mexico adopted our Bill of Rights. The former were such as to give rise to the ever-recurring questions as to the meaning of "due process" as used in the amendment, and the extent and nature of the state censorship thus set up. Corwin, "The Supreme Court and the Fourteenth Amendment," supra.

No such question bothers us. This clause is in our Constitution as the people's voluntary and studied limitation upon its Legislature. We could have had no purpose except to check the Legislature, as representing the majority for the time being, from encroachment upon this reserved right of the minority or of the individual. Those who complain of such checks are out of sympathy with constitutional government itself.

No one could have voted for our Constitution in the belief that the guaranty of life, liberty, and property did not limit legislative power, or that due process meant merely no-

tice and the opportunity to be heard, or that the clause was merely directory to the Legislature and not a mandate to the judiciary. Those who held such views no doubt voted against the Constitution. When they become the majority, they may amend it; a very different, and much simpler, matter than amending the Federal Constitution.

The statute before us bears no evidence of a legislative purpose by it to safeguard health, morals, or safety. No claims are here made that it was so intended or will so result. Facts of which we may take judicial notice, and none other are before us, do not argue, and we are unable to conclude, that the health, morals, or safety of the general public or of the class regulated are at all involved in the sustaining or the overthrow of the act; or that there is involved any other specific object for which we have become accustomed to some yielding of the principles of personal liberty and of private property.

That is not necessarily fatal to the statute. The police power is necessarily expansive. It must meet new conditions and standards. On the other hand, "liberty" is contractive. It is not an absolute thing. Any government at all encroaches upon it. "Liberty restrained by law" is our tradition.

The power to regulate the conduct of the individual for the common good, the police power, has never been bounded, and never will be. As said by Mr. Chief Justice Taft, dissenting in Adkins v. Children's Hospital, supra, the courts have been "laboriously engaged in pricking out a line in successive cases." No jurist has ever attempted to enumerate all the specific objects for which the power may be legitimately invoked. To such enumeration as definitions include, by way of illustration, there is always added "the general welfare."

Why, then, if the Legislature considers shorter hours of employment a good, may it not compel them, in its care for the general welfare?

If "general welfare" stands in these definitions, or explanations rather, on the same footing as health and safety, it will be difficult to answer the question. Any public legislation may and no doubt should be presumed to promote the general welfare. If the term be given its broad and usual meaning, there is no limit to the legislative power to regulate the individual except the legislator's oath and the possibility that the judge may disagree as to what is reasonably for the general welfare. But if such is the meaning of the term and definition, there is no point to the enumeration of specific objects, such as health and safety. The general expression would embrace those and all others. The general term, following the enumeration of specific objects, implies merely an inability better or more completely to define the police power. It does not of course mean that it is unlimited.

As conditions and standards have changed, courts have admitted regulations as reasonably related to the general welfare which would not formerly have stood the test. Other specific objects have been and may again

be added to health and safety. By this process liberty shrinks correspondingly as the police power expands. But it remains as a controlling principle.

This suggests the limit which may safely be set for the expansion of the police power. It may embrace more and more specific objects. It cannot destroy the principle. The object to be accomplished must not be merely to destroy liberty as an evil. The regulation must tend to some ulterior good. The deprivation of liberty must be incidental, not itself the substantial and direct end.

We are unable to find any ulterior purpose in this statute. It merely regulates hours, as an end in itself. We do not overlook arguments in favor of regulation. It may be contended that the shortest possible hours of toil are a social good, or that a wider spread of employment is good, economically and socially. These arguments favor regulation as against liberty. Regardless of their merit, they are inadmissible. The people considered that question in 1910, and decided in favor of liberty. Whether liberty or regulation the better promotes the general welfare is a question to arise when it is proposed to amend the Constitution. That is the "due process" called for.

A final question not unnaturally arises. In the minds of many the present widespread evil of unemployment is so great as to require or justify extraordinary measures by government. Revolution even is feared by some as a consequence of failure or inability to alleviate it. This suggests inquiry as to the so-called emergency powers of government.

The act bears on its face no evidence that it is the Legislature's plan for meeting an emergency. It contains no recitals or findings. Emergency was not declared, even for the purpose of giving it immediate effect. It was not declared to be for the "preservation of the public peace, health or safety," as bearing upon the people's reserved power to disapprove, suspend, and annul it. Its operation is not limited to the duration of any emergency. It stands as permanent state policy.

As a means of combating unemployment, the particular measure is very narrow. A serious attack upon the evil by this method would have taken wider range. It contains no provisions, such as are now familiar, for insuring the to be desired resultant of more jobs. Mercantile establishments might quite generally meet the situation by remaining open for shorter hours, or by staggering. The shorter hours compelled might result in proportionate decreases in wages. In that case, the net result would be merely to take from one to give to another.

So we find the evidence before us insufficient to warrant bringing into question any emergency powers the state may have to preserve its own existence and the peace and safety of the people. The nature and extent of such powers we do not consider here.

The judgment will be affirmed, and the cause remanded.

It is so ordered.

SADLER, HUDSPETH, BICKLEY, and ZINN, JJ., concur.