365 P.2d 652

**STATE of New Mexico, ex rel. CITY OF ALBUQUERQUE, Relator,**

v.

**George LAVENDER, Chairman, John F. Sudderth, Vice Chairman, J. R. Kastler, Secretary, Frank Tatsch, H. E. Leonard, Members of the State Highway Commission of the State of New Mexico; State Highway Commission of New Mexico; and D. B. Dixon, Chief Highway Engineer of State Highway Commission of New Mexico, Respondents.**

No. 6780.

Supreme Court of New Mexico.

July 13, 1961.

Rehearing Denied Nov. 3, 1961.

Frank Horan, Malcolm W. deVesty, James L. Parmelee, Jr., Stanley P. Zuris, Albuquerque, for relator.

Fred M. Standley, Hadley Kelsey, Joseph L. Droege, John C. Worden, Sp. Asst. Attys. Gen., Thomas O. Olson, First Asst. Atty. Gen., for respondents.

John E. Hall, Albuquerque, amicus curiae.

CARMODY, Justice.

This is an original proceeding in mandamus, in which the city of Albuquerque seeks to require the state highway commission to reimburse it for relocations of water and sewer lines, made necessary by reason of the construction of federal-aid highways on the interstate and primary system.

The parties will be referred to hereafter as the "city" and the "commission," respectively.

In 1957, the New Mexico legislature enacted Chapter 237, Laws of 1957, amending § 55–7–18, N.M.S.A., 1953, and which provided for reimbursement to public utilities for the relocation of their facilities. Portions of this chapter were adjudged unconstitutional in State Highway Commission v. Southern Union Gas Co., 1958, 65 N.M. 84, 332 P.2d 1007. However, in that case, the court declined to rule as to whether the city of Albuquerque was entitled to repayment of relocation costs which it had by reason of moving municipally owned facilities from its municipally owned right-of-way. Actually, by reason of this reservation in the above case, and additionally by reason of the enactment of Chapters 289 and 310 of the Laws of 1959 (§§ 55–7–21 through 55–7–29, N.M.S.A., 1953 Supp.), the city is seeking its relief.

Chapter 310, Laws of 1959, was enacted by the legislature in what was apparently an attempt to satisfy the constitutional objections announced in the Southern Union case, and a more detailed discussion of the statute will be attempted hereinafter.

The commission's return to the alternative writ seeks to justify its refusal to comply with the statutes, on the basis that it claims that there is a violation of art. IX, § 14, of the New Mexico Constitution, and the additional contention that the city has no property or property interest which can be compensated under art. II, § 20, of the New Mexico Constitution.

Although the city urges in three separate grounds its contention as to why the statutes referred to are constitutional, the contention can be summarized that municipalities are vastly different from private utilities, and therefore should be treated differently because of the public services rendered by them, and that a municipality is an arm of the state. Thus, the city attempts to circumvent the Southern Union holding, and both parties in their briefs deal, basically, only with the effect of the statutes on a municipality.

■ Without discussing the question as to the claimed differences between public and private utilities at any great length, we are of the opinion that the operation of water and sewer systems is a proprietary function of a municipality, not a governmental function, and therefore must stand on the same footing as privately owned utility facilities. We feel that State ex rel. Highway Comm. v. Town of Grants, 1960,

66 N.M. 355, 348 P.2d 274, answers this question, and that there is no necessity in considering the matter further, although we are cognizant that the city seeks to avoid the implication of the Grants case, but we are not impressed with this argument. We are cognizant also that § 2, subd. A of Chapter 310, defining "utility," states that:

"A. the term 'utility' shall mean and include *publicly, privately* and *cooperatively owned utilities, without distinction,* for the rendition of *water,* electric power, *sanitary sewer,* storm sewer, steam, fuel gas, telephone or telegraph service through a system of pipes or wires devoted to public utility service." (Emphasis added.)

Thus, if the statute is unconstitutional at all, it is unconstitutional as to municipalities operating utilities in a proprietary capacity, just as it is to a private utility. We can see no other possible construction of the language of art. IX, § 14, New Mexico Constitution, wherein the words "public or private corporation" are used. See, also, McQuillin, vol. 1, § 2.03, at 448, 449 and 450.

As above stated, the city in its brief argues the limited question as to the difference between a municipally owned utility and a privately owned utility, insofar as the constitutionality of the statute is concerned. The commission by its brief answers this proposition, and by a general statement only, claims that the statute is unconstitutional under the Southern Union case. The court is referred by counsel to the briefs in the Southern Union case as though this were dispositive of all contentions, and, impliedly at least, that the 1959 legislation is identical with the 1957 legislation. In any event, in view of our determination that there is no practical difference between municipally owned utilities and those privately owned, it therefore becomes necessary to dispose of the constitutionality of the statute, even though the point is not directly raised and is certainly not in any sense properly or adequately briefed.

In declaring certain portions of the 1957 Act unconstitutional, the court made the following statement:

" 'Here the legislature has not authorized the State Highway Commission to expend public funds for such relocation purpose but has directed the paying over of such funds to the Southern Union Gas Company, not under the control of the Highway Commission or the state, to be used by the Southern Union Gas Company in discharging an obligation assumed by it, thereby relieving it of the expenditure of its own funds to the extent of the aid advanced by the state.' " [65 N.M. 84, 332 P.2d 1012.]

The legislature attempted at least to get around this particular statement by in-

cluding certain protective provisions in the 1959 Act (Chapter 310) as follows:

Section 3. Relocation Of Utility Facilities Authorized.—

"A. The commission may, after notice and hearing, by order provide for the relocation of utility facilities within a public highway (including, if required, the entire removal therefrom of certain facilities except as necessary to serve abutting premises or as necessary to cross the highway) and may require any utility to make or suffer any such specified relocation, upon a finding that the action provided for is necessitated by highway improvement determined upon by the commission as a matter of policy relating to the design, construction, location and maintenance of public highways; and the commission shall direct and control the reasonable manner and time of effecting any such relocation so as to promote the public interest in the highway improvement without undue cost or risk and without impairment of utility service, whether·the commission undertakes the relocation on behalf of the state or requires the utility to perform such relocation. If undertaken by the commission, it may contract such relocation work.

"B. The obligation of the utility shall be to make or suffer relocation as so required by the commission, and to do so cooperatively and in the reasonable manner and time as may be prescribed by the commission, and to advance and pay all costs incurred in effecting relocation which the state is not authorized to pay hereunder or otherwise by law. It shall not be grounds for delay in relocation that a dispute exists over the cost of relocation or the method of paying or sharing same.

"C. The commission is authorized to enter into an agreement with a utility with respect to any relocation, the time and manner of its accomplishment and the payment and sharing of the cost incurred in effecting relocation, all upon such reasonable terms and conditions as the commission shall approve as necessary or appropriate in the interest of a public highway program in this state; and in such event no notice, hearing or other proceedings under this act shall be required.

"Section 4. State Pays Certain Relocation Costs.—

"A. In the following types of utility relocation ordered by the commission pursuant to section 3A it shall either, as it elects, undertake the relocation work on behalf of the state, paying the cost of relocation, or reimburse the utility for the cost of relocation:

"(1) relocations necessitated by improvements of public highways in the interstate system, including extensions thereof within urban areas; and

"(2) relocations by complete removal and construction of facilities off the public highway.

"The commission is authorized upon notice and opportunity for hearing to find and determine in relocations hereunder the cost of relocation, and the same shall, to the extent authorized herein, be borne by the state as other highway construction costs.

"The commission is authorized to make rules and regulations with respect to the advancement and/or payment from time to time of funds by utilities to insure that the state shall never advance nor pay any costs which it is not authorized by law to pay, including rules and regulation [sic] with respect to the proper determination of cost of relocation payable or reimbursible by the state, to aid the commission in carrying out the intention of this act; and this [sic] provisions shall be cumulative of other authority possessed by the commission to promulgate rules and regulations.

"B. Exceptions

"(1) The cost of relocation from which a utility would be otherwise relieved pursuant to sub-paragraph A(1) above shall nevertheless be borne in full by the utility in any of the following cases, without reimbursement from the state:

"(a) in case of a privately owned utility which is obligated, or to the extent it is obligated by valid, written contract with the state to make such relocation when called for by the state without cost to the latter;

"(b) in case the utility line was initially installed, or for the distance to which it was installed, under a valid statute or regulation applicable thereto and providing that relocation should be effected by the owner thereof at the latter's expense;

"(c) in case of relocation of a utility facility not municipally owned for which local municipal or county government authorization, if required by law, had not been granted;

"(d) in case the utility shall after effectiveness of this act agree for a valid consideration to effect the relocation at its expense under the terms of such agreement; or

"(e) in case of any required relocation with respect to which the commission shall determine that the utility failed without just cause to make or suffer such relocation in the reasonable manner and time as prescribed by the commission."

In addition, as a part of Chapter 310, there was a declaration of public policy, a portion of which reads as follows:

"Section 1.—Declaration Of Policy.

"A. The construction of modern highways is necessary to promote public safety, facilitate the movement of present day motor traffic, both interstate and intrastate in character, and to promote the national defense, and in the construction of such highways it is also in the public interest to provide for the orderly and economical relocation of utilities when made necessary by such highway improvements, including extensions thereof within urban areas, without occasioning utility service interruptions or unnecessary hazards to the health, safety and welfare of the traveling or utility consuming public.

\*　　\*　　\*　　\*　　\*　　\*

"D. The burden of such utility relocations is a burden on the public in this state, whether initially borne by the state or the utility or in part by both, and it is, therefore, in the public interest that such burden be minimized to the extent that same can be done consistently with the principal purpose of such highways for vehicular movement of persons and property; therefore, it is the intent of the legislature to insure that the state's police power in requiring relocation of utilities shall be exercised in a reasonable manner.

"E. Utility relocations necessitated by construction of public highways or improvements thereto are a public governmental function, properly a part of such construction, and to the extent in this Act provided such relocations shall be made at state expense; however, although made in obedience to the commission's orders in exercise of the police power under this act, relocations hereunder for which compensation is not provided by this act or otherwise by law are declared to be damnum absque injuria and no claim therefore shall be enforceable against the state. Utility relocations to which this act is applicable shall be made only in pursuance hereof."

It is not deemed necessary to set out the pertinent provisions of the 1957 Act as the same are set out in Southern Union, supra, but it is apparent that under the 1959 Act the highway commission itself is authorized to undertake the relocation work on behalf of the state, and it may contract the work, or may require the utility to perform the same under the control of the commission.

Under § 4, subd. B(1), reimbursement is expressly prohibited if the utility facilities were initially installed pursuant to a

valid statute, regulation or contract which required the owner to relocate the facilities at its own expense. So, also, reimbursement is prohibited if the facilities were installed without proper authorization. Thus, it would seem that under the 1959 Act, as distinguished from the 1957 Act, (1) the legislature has authorized the commission itself to expend public funds for the relocation of utility facilities; (2) the utility, as to relocations, is under the absolute control of the commission and is merely acting as a contractor for the state; and (3) the legislature has expressly prohibited reimbursement for relocation in cases where there is a specific obligation on the part of the utility to relocate.

It need also be noted that § 4, subd. A, supra, is somewhat in the nature of a statement of policy as heretofore recognized by the courts that the complete ouster of a utility from a public highway may constitute a taking of contract or property rights when the utility has been installed pursuant to statutory authority. See, Mountain States Tel. & Tel. Co. v. Town of Belen, 1952, 56 N.M. 415, 244 P.2d 1112; City of Roswell v. Mountain States Telephone & Tel. Co., 10 Cir., 1935, 78 F.2d 379; and Russell v. Sebastian, 1914, 233 U.S. 195, 34 S.Ct. 517, 58 L.Ed. 912.

The above is a fundamental principle of the law in the state of New Mexico, which apparently was overlooked in the Southern Union decision. Whether this principle is recognized in Tennessee we do not know, but on the assumption that that court does not recognize this principle, our reliance to a considerable extent on State ex rel. (Leech) v. Southern Bell Telephone & Telegraph Co., 1958, 204 Tenn. 207, 319 S.W.2d 90, was of doubtful validity.

Also, as an additional distinction between the 1957 and the 1959 Acts, the provisions of the 1959 Act apply only to cases involving the construction of interstate and defense system highways, rather than on all federal-aid highways. This distinction is of considerable importance when it is realized that these particular highways are designed primarily for the nation as a whole, not merely for a community or for the state of New Mexico.

It would see that the bedrock basis of the decision in Southern Union was that the court felt that there was no "obligation" running between the state and the defendant in that case, and that therefore the reimbursement constituted a donation in aid of private enterprise, thus running counter to § 14 of art. IX, New Mexico Constitution.

We recognize the doctrine that, under the common law, the state can compel a utility to relocate its facilities without expense to the state. See, Southern Union, supra, and State ex rel. Highway Comm. v. Town of Grants, 1960, 66 N.M. 355, 348

P.2d 274. It is thus apparent that the state may inflict injury under its police power without incurring liability for damages. However, does the mere fact that the state may do so without liability, contrariwise, impose an obligation on the utility for which the state may in no sense be responsible? We do not believe so. The legislature is the branch of the government charged with the duty of placing in operation the police power and providing how it is to be exercised. We mentioned in the Town of Grants case this principle of the police power of the state, which was apparently not recognized by the opinion of the court in Southern Union. Therefore, it would seem that the crux of the question must rest upon a determination of what is an "obligation."

The court, in State v. City of Austin, Tex.1960, 331 S.W.2d 737, 742, discussed this very problem. The Texas constitutional provisions are even more definite than ours. They read as follows:

"Article III, Section 51: The Legislature shall have no power to make any grant or authorize the making of any grant of public moneys to any individual, association of individuals, municipal or other corporations whatsoever; * * *."

"Article III, Section 50: The Legislature shall have no power to give or to lend, or to authorize the giving or lending, of the credit of the State in aid of, or to any person, association or corporation, whether municipal or other, or to pledge the credit of the State in any manner whatsoever, for the payment of the liabilities, present or prospective, of any individual, association of individuals, municipal or other corporation whatsoever."

"Article III, Section 55: The Legislature shall have no power to release or extinguish, or to authorize the releasing or extinguishing in whole or in part, the indebtedness, liability or obligation of any corporation or individual, to this State or to any county or defined sub-division thereof, or other municipal corporation therein, except delinquent taxes which have been due for a period of at least ten years. * * * *"

The opinion of the Supreme Court of Texas disposes of the question of the nature of "obligation" in this language:

"After the occurrence of events which under the law then existing give rise to an obligation on the part of an individual or corporation to the state, the Legislature has no power to release or diminish that obligation without consideration. Empire Gas & Fuel Co. v. State, 121 Tex. 138, 47 S.W.2d 265. See also Delta County v. Blackburn, 100 Tex. 51, 93 S.W. 419. Moreover, the use of public money to pay a claim

predicated on facts which generate no state liability constitutes a gift or donation in violation of our Constitution. See Tompkins v. Williams, Tex.Com. App., 62 S.W.2d 70. Respondents could not, therefore, be reimbursed for all or any part of the expense incurred by them in relocating their lines prior to the adoption of House Bill 179. But the statute does not operate retrospectively, and respondents claim no right to reimbursement for costs incurred before it became effective.

"Although petitioner argues otherwise, it cannot be said that respondents are under an absolute and continuing legal obligation to relocate at their own expense any utility installations owned by them and situated in public ways whenever such relocation is made necessary by highway improvements. Their use of streets and highways for this purpose is simply subject at all times to a valid exercise of the police power of the state. It is only when the full measure of that power is exerted that they are obligated to make the installations conform to highway improvements at their own expense. This duty would arise upon, and not before, the making of a lawful demand for relocation of the facilities. Here the Legislature has empowered the State Highway Commission to construct interstate and defense highways and to direct municipalities and utility companies to relocate their facilities. That grant of authority is conditioned, however, by the requirement that the utilities be reimbursed for the expense which they incur. In our opinion this does not constitute the release of an obligation to the state within the meaning of Article III, Section 55, of the Constitution. See State ex rel. Jones v. Chariton Drainage District No. 1, 252 Mo. 345, 158 S.W. 633.

\*　　\*　　\*　　\*　　\*　　\*

"In considering this question, it should be noted that no net gain accrues to the utility from the relocation of its facilities in the manner and under the conditions prescribed by the statute. 'Cost of relocation' is defined as including the entire amount paid by the utility properly attributable to such relocation after deducting any increase in value of the new facility and any salvage value derived from the old facility. As pointed out by the Supreme Court of Minnesota, the reimbursement merely restores the utilities to the position in which they were prior to the relocation of their facilities. Minneapolis Gas Co. v. Zimmerman [253 Minn. 164, 91 N.W.2d 642], supra. It also is clear that if not reimbursed for their non-betterment costs, respondents will be subjected to

substantial expense as a direct result of the highway improvement program.

"Respondents benefit from the statute only in the sense that they are relieved of a financial burden which they could be required to bear. The question to be decided then is whether the use of public funds to pay part or all of the loss or expense to which an individual or corporation is subjected by the state in the exercise of its police power is an unconstitutional donation for a private purpose. We think not provided the statute creating the right of reimbursement operates prospectively, deals with the matter in which the public has a real and legitimate interest, and is not fraudulent, arbitrary or capricious."

The Texas court is not alone in this construction, a similar view having been adopted by the highest courts of the following jurisdictions: New York, Maine, New Hampshire, Minnesota, North Dakota, Utah, Montana and Delaware.

Since our decision in Southern Union, several other states have had occasion to construe relocation statutes. In only one, Idaho (State ex rel. Rich v. Idaho Power Company, 1959, 81 Idaho 487, 346 P.2d 596), was the statute declared unconstitutional. Other cases which have been decided subsequent to Southern Union, supra, sustaining the constitutionality of the stat-

utes, are Northwestern Bell Telephone Co. v. Wentz, N.D.1960, 103 N.W.2d 245; State Road Com. of Utah v. Utah Power & Light Co., 1960, 10 Utah 2d 333, 353 P.2d 171; Jones v. Burns, Mont.1960, 357 P.2d 22; and State Highway Department v. Delaware Power & Light Co., Del.1961, 167 A.2d 27. A discussion of some of these cases and the earlier ones mentioned in Southern Union is contained in the annotation, 75 A.L.R.2d 419. Thus, at the present time, Tennessee, New Mexico and Idaho stand alone in finding constitutional objections to such statutes, and it should be noted that the Tennessee decision was by a divided court, as was that in Idaho. On a numerical basis, therefore, it appears that at least eight states have sustained the constitutionality of relocation statutes, as against a minority of three holding to the contrary. Naturally, the verbiage of the various state constitutional provisions varies greatly, but in practically all instances the general meaning is the same. Having given serious consideration to the authorities from other jurisdictions, including their constitutional provisions, we are of the opinion that the majority holding is the better reasoned and more in keeping with the theory of a growing, living constitution. We are not persuaded otherwise by anything that was said in Southern Union, although a different statute was there being considered. We reach our conclusion that Chapter 310 does not constitute a release

of an obligation to the state, not merely from what we have said, but also because of our view of what is encompassed within the doctrine of police power.

It would unduly lengthen this opinion to discuss the history and background of the initial passage of the federal and state statutes dealing with relocation. Most of the above cases having done so, we do not feel it would be any aid for us to repeat what is said therein.

█ The police power of the state has been variously defined, but, for our purposes, the following statement from State ex rel. Hughes v. Cleveland, 1943, 47 N.M. 230 at page 242, 141 P.2d 192, 200, is a well considered expression of the meaning of the power:

"The police power 'is not a rule; it is an evolution.' 28 R.C.L. 742, § 36; State v. Mountain Timber Co., 75 Wash. 581, 135 P. 645, L.R.A.1917D, 10. Laws providing for preservation of the public peace, health and safety are essentially police measures and represent an exercise of this inherent power. It is the broadest power possessed by governments and rests fundamentally on the ancient maxim 'salus populi est suprema lex'. Traditionally, it was limited in its operation to laws concerned with the public health, safety and morals. This historic field for its operation now has been extended to embrace laws for the promotion of the general welfare, prosperity, comfort and convenience. * * *"

In addition, in State v. Spears, 1953, 57 N.M. 400, 259 P.2d 356, 363, 39 A.L.R.2d 595, we stated:

"A large discretion is necessarily vested in the Legislature to determine, not only what the interests of the public require, but what measures are necessary for the protection of such interests."

Also, in Barwin v. Reidy, 1957, 62 N.M. 183, 307 P.2d 175, 181, we approved of the following definition of "public policy":

" 'Public policy has been aptly described by one of our judges as "a wide domain of shifting sands." * * * The term in itself imports something that is uncertain and fluctuating, varying with the changing economic needs, social customs, and moral aspirations of a people. * * * For that reason it has frequently been said that the expressive public policy is not susceptible of exact definition. But for purposes of juridical application it may be regarded as well settled that a state has no public policy, properly cognizable by the courts, which is not derived, or derivable by clear implication from the established law of the state, as found in its Constitution, statutes, and judicial decisions. * * * Hence, since * * * "it is the duty of the

Legislature to make laws and of the court to expound them, * * * the subjects in which the court undertakes to make the law by mere declaration (of public policy) should not be increased in number without the clearest reasons and the most pressing necessity." ' * * * "

■■ It is the policy of this court to construe statutes in the light that they are presumed constitutional rather than unconstitutional. We have stated this principle in varying ways, on many different occasions. See, for example, Arnold v. Board of Barber Examiners, 1941, 45 N.M. 57, 109 P.2d 779; State ex rel. New Mexico Dry Cleaning Board v. Cauthen, 1944, 48 N.M. 436, 152 P.2d 255; Fowler v. Corlett, 1952, 56 N.M. 430, 244 P.2d 1122; State v. Thompson, 1952, 57 N.M. 459, 260 P.2d 370; and State ex rel. Dickson v. Saiz, 1957, 62 N.M. 227, 308 P.2d 205. Here the legislature has determined that as a matter of public policy the non-betterment cost of the relocation of utility facilities should in certain instances be borne by the state. This determination is entitled to great weight, and unless the act is violative of the constitution, the legislative pronouncement is very persuasive. Were it otherwise, the court would be substituting its judgment for that of the legislature.

■ In the passage of Chapter 310, Laws of 1959, the legislature apparently considered that the construction of interstate highways, through a locality such as Albuquerque, is for the primary benefit of interstate travelers and public transportation facilities making use of such thoroughfares, rather than the citizens of the community itself. It was also common knowledge that the construction of these interstate highways would of necessity require the relocation of many utility facilities. Thus, the legislature was attempting to aid the citizens of the state of New Mexico, as distinguished from making any type of donation from the funds of the state. We believe that the statute in question is an exercise of police power, and the mere fact that the legislature did not see fit to exercise the power to its fullest extent does not make the act any the less effective. It is obvious that unless the legislature made some provision for the orderly relocation of utility facilities in the path of highway construction, great danger could result affecting not only the traveling public but the health, safety, welfare and convenience of the tremendous group of utility consuming public, which is dependent on the services furnished.

■ It is also obvious that unless relocation costs are paid out of the public highway fund, the utility users will ultimately pay more than their fair share of the costs of interstate and defense highways. The utility companies, if required to bear

relocation costs, will simply raise their rates to cover such costs. The relatively small portion of the public affected by such raises will therefore be forced to bear highway costs which benefit the entire public and this after they have already paid a proportionate share of the total highway expenses. In exercising its police power, we think the state may legitimately and properly consider the effect, not only upon the entire public, but also upon particular segments thereof, and evolve a plan and scheme which will accomplish the greatest public good at the least expense to those adversely affected. When we speak of forcing the utility companies to bear relocation costs, we are overlooking the practical fact that such costs will be passed on to the utility consuming public. Thus, we see in the statute under consideration a legitimate and equitable apportionment of costs of relocations rather than a donation to utility companies.

◼ The legislature may enact laws for the benefit of society at large. State v. Brooken, 1914, 19 N.M. 404, 143 P. 479, L.R.A.1915B, 213; see, also, State ex rel. Hughes v. Cleveland, supra. We are of the opinion that Chapter 310 is such a law, although we do not say that the primary purpose of rights-of-way is for the location of utility facilities. Certainly, it is a very important and necessary purpose. In congested areas, it would be practically impossible to provide for water,

sewer, light, heat, or communication services without the use of rights-of-way. These and other uses are of almost equal importance to residents of the communities served, as are the highways themselves.

◼ The statement in Southern Union, that New Mexico has never recognized that one of the primary purposes for which highways are designed is for location of utility facilities, was made in order to distinguish the leading contrary case, Minneapolis Gas Company v. Zimmerman, 1958, 253 Minn. 164, 91 N.W.2d 642. Actually, this statement is erroneous when it is considered that there has been unquestioned statutory authority for such use of highway rights-of-way for more than fifty years. See, Session Laws of 1909, ch. 141 (§ 68–1–1, N.M.S.A., 1953), and see also, § 55–2–7(c), N.M.S.A., 1953, and the rights of the utility established thereby recognized in Mountain States Tel. & Tel. Co. v. Town of Belen, supra; City of Roswell v. Mountain States Telephone & Tel. Co., supra; and Russell v. Sebastian, supra. The Minnesota decision was soundly based on a prior decision of that court in Cater v. Northwestern Tel. Exch. Co., 1895, 60 Minn. 539, 63 N.W. 111, 28 L.R.A. 310, which held that the use of highway easements for utility services was within the general purpose for which highways are designed, in addition to their use for transportation of movable vehicles. We agree. To hold otherwise would be to

ignore the practical, as well as the legal, aspects of the situation.

We believe that Justice Cardozo's opinion in Oswego & S. R. Co. v. State, 1919, 226 N.Y. 351, 124 N.E. 8, 10, (which received so little note in Southern Union, but is quoted at length in the Minneapolis Gas case), is particularly applicable to the present case. The Oswego case was decided years before the current highway program was instituted, but the analogy is clear. The case involved the expense of rebuilding a railroad bridge to meet the specifications of the state operated Barge Canal. The bridge was originally constructed under a permit from the state, which provided that the bridge must be removed when required at the "cost and expense" of the railroad. The decision allowed the railroad to recover its expenses for the new bridge and held that the existence of the written permit made no difference, i. e., that the duty on the part of the railroad to remove was the same, whether the reservation was express or implied. Justice Cardozo's reasoning applies to the present case, just as it did to the case before the New York Court of Appeals.

" * * * The state was about to execute a great public work. It saw that in the doing of that work there would be destruction of private property. Much of the damage would be damnum absque injuria. None the less it would be damage. The result would be in-equality in the distribution of public burdens. Some would pay more dearly than others in proportion to benefits received. This inequality the Legislature, fixing in advance the conditions of the undertaking, had the power to correct. It might refuse to launch an enterprise at the price of hardship and oppression. There was power to destroy, and leave the loss where it might fall. There was also power to pay for the destruction, and thereby re-establish some uniformity of proportion between benefits and burdens. The question was for the Legislature whether the equity of compensation was strong enough to merit recognition. We cannot hold it to be illusory."

We approve a proper balancing of the benefits to be obtained by the exercise of the state's police power in requiring the relocations of utilities at the sole expense of the owners thereof, as opposed to the burdens, fully justifies the expenditure of public monies for the purpose of doing equity.

The basic theory as stated by Justice Cardozo has been substantially followed by all of the courts entertaining the majority view on this problem, as is well illustrated by what was recently said in State Road Comm. of Utah v. Utah Power & Light Co., supra:

"Utility relocations are ordered by virtue of the police power of the state.

This power must be exercised fairly. The relocations will result in destruction and loss of some of the facilities. Expenditures for engineering, labor, and materials will be incurred. The cost is occasioned at the instance of the state and federal governments for the benefit of all the people. The utilities are in no way to blame that their facilities happen to be in the way of this improvement. We do not deem it to be unfair for the legislature to provide that they be reimbursed for the actual expense of their removal. This presents a question of morality and justice, closely coupled with the interest of the public as beneficiaries, taxpayers, and utility customers. The question is manifestly one for the legislature. It is a case where the state should set the example * * * and should be bound by the same concepts of justice and morality as its individual members * * * (citation)." [10 Utah 2d 333, 353 P.2d 176.]

Respondents rely in part on State ex rel. Mechem v. Hannah, 1957, 63 N.M. 110, 314 P.2d 714. However, that case involved a law which provided for donations or gifts out of the public treasury to individuals not falling within the classification of "sick or indigent persons." The donations were not for a public purpose and were of a character which under art. IX, § 14, could not be for a public purpose unless made "for the care and maintenance of sick and indigent persons." That case did not in the slightest degree involve the taking or damaging by the state under its police power of any property belonging to the donee. Therefore we feel that that case is not authority for respondents' position and that there is no conflict between its holding and that expressed in this opinion.

One other matter that merits comment is the fact that, in Southern Union, we said that public funds could only be paid over to a subordinate governmental agency under the absolute control of the state. This statement arose because of a long-standing error that was made in one of the opinions in Harrington v. Atteberry, 1915, 21 N.M. 50, 153 P. 1041, and which was carried forward in Hutcheson v. Atherton, 1940, 44 N.M. 144, 99 P.2d 462. In the original Harrington case, Chief Justice Roberts' opinion is given as the opinion of the court, although it was not concurred in by the other two justices. The actual opinion in that case was to the effect that the appropriation was in violation of § 31 of art. IV of the Constitution, which contains the language, "not under the absolute control of the state." With the passage of time, Chief Justice Roberts' opinion, which said that the appropriation was in conflict with § 14 of art. IX, became somehow interwoven with the actual majority opinion. In any event, § 31 of art. IV of the New Mexico Constitution is not at issue and can have no bear-

⬛

ing on this proceeding, it having to do with appropriations to charitable, educational or other benevolent purposes. However, it is quite apparent that the blending together of the two constitutional provisions has caused considerable difficulty, and may have contributed, in part at least, to the determination that the 1957 Act was unconstitutional.

⬛ We are of the opinion that Chapter 310 is not unconstitutional on any of the grounds contended by the commission. The decision in State Highway Commission v. Southern Union Gas Co., 1958, 65 N.M. 84, 332 P.2d 1007, is overruled in all aspects in which it is in conflict with our views herein expressed. However, we do not intend thereby to impliedly signify our approval of the 1957 statute, and it should suffice to say that it is within the province of the legislature to repeal the present law at any time, in which event the costs for relocation would again be the responsibility of the utility, in accordance with the common law as it heretofore existed.

⬛ In the briefs as originally submitted, no particular argument was made as to the applicability or constitutionality of Chapter 289, Laws of 1959 (§§ 55-7-21 and 55-7-22, Pocket Supp., N.M.S.A., 1953). However, by motion for rehearing, relators and certain other municipalities as amici curiae earnestly maintain that this chapter is constitutional, which is vigorously opposed by respondents. Relator and the amici curiae are particularly interested as to this chapter because it, in substance, provides that the state shall pay for municipally owned relocations on the *primary* system, in addition to those provided for under Chapter 310, i. e., interstate and defense system highways, and, in addition, Chapter 289 provides that payment shall be made for all such relocations since the initial passage of the 1957 Act. We have herein concluded that there is little distinction between privately owned and municipally owned utilities. Therefore, the provisions of Chapter 289 which attempt to provide for reimbursement of relocation costs retrospectively to March 29, 1957, are in direct conflict with the following two sections of the New Mexico Constitution: Art. IX, § 14; and Art. IV, § 24. In this connection, see quotations from State v. City of Austin, supra. The act in question also offends Art. IV, § 24, in another manner, in the sense that it is special legislation applying arbitrarily to municipally owned utilities and not based on any substantial distinction between all utilities as a class. See, State v. Atchison, T. & S. F. Ry. Co., 1915, 20 N.M. 562, 151 P. 305. It would also appear that the act attempts to grant rights, privileges or immunities in an unequal manner so as to be contrary to Art. IV, § 26, of the New Mexico Constitution. In addition, there is serious doubt as to the validity of the chapter in question when we consider the equal pro-

tection clause of Art. II, § 18, New Mexico Constitution. In any event, we are of the opinion that this particular chapter is unconstitutional and void.

From what has been said, therefore, the alternative writ of mandamus will be made absolute and will be considered as effective with respect to the present members of the state highway commission as though they had been named in this cause.

It is so ordered.

SAMUEL Z. MONTOYA and GEO. L. REESE, Jr., District Judges, concur.

COMPTON, C. J., and E. T. HENSLEY, Jr., District Judge, dissenting.

CHAVEZ, MOISE and NOBLE, JJ., not participating.

E. T. HENSLEY, Jr., District Judge (dissenting).

The majority state that the issue to be determined is whether or not Chapter 310, Laws of 1959, violates Article IX, section 14, of the New Mexico Constitution. With that analysis I agree.

The majority state that the city of Albuquerque for all practical purposes in this case must stand on the same footing as a private utility, or corporation. With that appraisal I agree.

The majority opinion does not include the rule by which the statute in controversy in this case must be measured. It is as follows: Article IX, section 14.

"Neither the state, nor any county, school district, or municipality, except as otherwise provided in this Constitution, shall directly or indirectly lend or pledge its credit, or make any donation to or in aid of any person, association or public or private corporation, or in aid of any private enterprise for the construction of any railroad; provided, nothing herein shall be construed to prohibit the state or any county or municipality from making provision for the care and maintenance of sick and indigent persons."

This is a positive restriction. It builds with clear and simple words a barrier not to be broken. The language of Chief Justice Watson in State v. Henry, 37 N.M. 536, 25 P.2d 204, 208, 90 A.L.R. 805, although concerned with another section of our Constitution, should again be called to mind. It is as follows:

" * * * This clause is in our Constitution as the people's voluntary and studied limitation upon its Legislature. We could have had no purpose except to check the Legislature, as representing the majority for the time being, from encroachment upon this reserved right of the minority or of the individual. Those who complain of such checks are out of sympathy with constitutional government itself."

238

The principle here involved is no different than it was in State ex rel. Mechem v. Hannah, 63 N.M. 110, 314 P.2d 714. The majority would distinguish the two cases with the statement that in State v. Hannah the police power was not considered. That does not constitute a distinction. It must be borne in mind that the legislature possesses no force, either through the exercise of the police power, or any other words of magic sufficient to dissolve the barrier of the constitutional limitation.

Admittedly it is within the province of the legislature to exercise the police power of the state. When done, it is not a function of the court to question, approve or disapprove of the exercise if it is not void. On the other hand, if the exercise does violence to the constitution, it is the duty of the court to point out wherein the legislation is void. Whether or not the legislation is economically expedient, whether or not a super highway through a metropolitan center will promote national defense, whether or not the cost is to be borne by few or many, all these are considerations foreign to this forum in this case.

Believing that the majority opinion sanctions a violation of Article IX, section 14 of the New Mexico Constitution, I dissent.

COMPTON, C. J., concurs.